# STATE OF MICHIGAN

# COURT OF APPEALS

EARL H. ALLARD, JR.,

        Plaintiff-Appellee,

v

CHRISTINE A. ALLARD,

        Defendant-Appellant.

FOR PUBLICATION
December 18, 2014
9:05 a.m.

No. 308194
Wayne Circuit Court
Family Division
LC No. 10-110358-DM

Before: M.J. KELLY, P.J., and WILDER and FORT HOOD, JJ.

WILDER, J.

Defendant appeals as of right a judgment of divorce entered by the trial court. We affirm in part, reverse in part, and remand for further proceedings.

I

The parties signed an antenuptial agreement on September 9, 1993, two days before their wedding on September 11, 1993. This case primarily deals with the validity and enforcement of that antenuptial agreement.

In August 1992, plaintiff's father, who was ill and hospitalized for treatment of lung cancer, summoned his family attorney, John Carlisle, to the hospital and instructed him to draft antenuptial agreements for his two sons. Plaintiff's father had advised plaintiff that, while it was his intention to leave him a substantial inheritance in the event of his death, he would not do so if plaintiff had not secured an antenuptial agreement before he married. Carlisle did not actually draft any antenuptial agreements until he was approached by plaintiff in mid-to-late summer 1993.

Approximately 10 days before their wedding, plaintiff gave defendant a draft of an antenuptial agreement dated August 25, 1993. Plaintiff and defendant discussed his father's expression that he did not approve plaintiff getting married unless he and defendant first signed an antenuptial agreement, and his intention to honor his father's wishes. Evidently, defendant did not consult with an attorney about the agreement; instead, she consulted with her father, who had signed an antenuptial agreement prior to his second marriage. On September 9, the day of the rehearsal dinner, plaintiff reminded defendant that his father was adamant that, if she did not

-1-

sign the agreement, there should be no wedding, and that plaintiff intended to honor his father's wishes. Both plaintiff and defendant then drove together to Carlisle's office.

There is no dispute that, at some point in time, whether 10 days before the wedding or at some other occasion, defendant asked Carlisle what would happen if plaintiff died during their marriage. According to Carlisle, in direct response to defendant's question, he added a life insurance provision to the agreement. According to defendant, the draft agreement already contained a life insurance provision, and her question to Carlisle prompted an increase in the coverage from $200,000 to $250,000.[1]

At the September 9 meeting, Carlisle reiterated to defendant that there would be no wedding if she did not sign the agreement, which she then did, but claimed she wanted to write "signed under duress" on the document and was not permitted to do so by Carlisle. Carlisle disputed defendant's recollection, stating in his deposition that defendant was pleasant at the September 9 meeting and had never mentioned feeling forced to sign the agreement.

The pertinent sections of the signed antenuptial agreement provide as follows:

4.      Each party shall during his or her lifetime keep and retain sole ownership, control, and enjoyment of all real, personal, intangible, or mixed property now owned, free and clear of any claim by the other party. However, provided that nothing herein contained shall be construed to prohibit the parties from at any time creating interests in real estate as tenants by the entireties or in personal property as joint tenants with rights of survivorship and to the extent that said interest is created, it shall, in the event of divorce, be divided equally between the parties. At the death of the first of the parties hereto, any property held by the parties as such tenants by the entireties or joint tenants with rights of survivorship shall pass to the surviving party.

5.      In the event that the marriage . . . terminate[s] as a result of divorce, then, in full satisfaction, settlement, and discharge of any and all rights or claims of alimony, support, property division, or other rights or claims of any kind, nature, or description incident to marriage and divorce (including any right to payment of legal fees incident to a divorce), under the present or future statutes and laws of common law of the state of Michigan or any other jurisdiction (all of which are hereby waived and released), the parties agree that all property acquired after the marriage between the parties shall be divided between the parties with each party

---

[1] Both the August 25, 1993, and the September 9, 1993, versions of the agreement were submitted in evidence. Both have the same ¶ 16, which requires plaintiff to carry a life insurance policy of $200,000. The only difference of any substance between the two documents is located in ¶ 11.c; the August 25 draft states that each party "has entered into this agreement freely and voluntarily after taking into account the advice of his or her own legal counsel," while the signed September 9 agreement omitted the phrase "after taking into account the advice of his or her own legal counsel."

receiving 50 percent of the said property. However, notwithstanding the above, the following property acquired after the marriage will remain the sole and separate property of the party acquiring the property and/or named on the property:

       a.    As provided in paragraph Two and Three of this antenuptial agreement, any increase in the value of any property, rents, profits, or dividends arising from property previously owned by either party shall remain the sole and separate property of that party.

       b.    Any property acquired in either party's individual capacity or name during the marriage, including any contributions to retirement plans (including but not limited to IRAs, 401(k) plans, SEP IRAs, IRA rollovers, and pension plans), shall remain the sole and separate property of the party named on the account or the party who acquired the property in his or her individual capacity or name.

\* \* \*

8. Each party shall, without compensation, join as grantor in any and all conveyances of property made by the other party or by his or her heirs, devises, or personal representatives, thereby relinquishing all claim to the property so conveyed, including without limitation any dower or homestead rights, and each party shall further, upon the other's request, take any and all steps and execute, acknowledge, and deliver to the other party any and all further instruments necessary or expedient to effectuate the purpose and intent of this agreement.

\* \* \*

10. Each party acknowledges that the other party has advised him or her of the other party's means, resources, income, and the nature and extent of the other party's properties and holdings (including, but not limited to, the financial information set forth in exhibit A attached hereto and incorporated herein by reference) and that there is a likelihood for substantial appreciation of those assets subsequent to the marriage of the parties.

Included with the agreement was plaintiff's disclosure statement, which provided that he already had approximately $400,000 in net worth.

The parties were married on September 11, 1993. During the course of the marriage, the parties held a joint checking account with Private Bank, which was closed in November 2010. There were no other jointly held accounts. Defendant worked at two different advertising agencies the first several years of the marriage. At the end of her employment, she earned approximately $30,000 per year. In 1999, after she became pregnant with the couple's second child, defendant stopped working and did not seek further employment.

Plaintiff received numerous cash gifts from his parents during the marriage, often totaling $20,000 per year. Plaintiff also testified to receiving loans from his father during the course of the marriage, and claims that these were some of the funds he used to purchase some of the real estate he purchased during the marriage. Plaintiff also formed six limited liability companies ("LLCs") during the marriage and served as the sole member.[2] James R. Graves, who prepared federal and state tax returns for the parties, testified that because these were single-member LLCs, the LLCs were treated as disregarded entities for tax purposes.[3] Graves also testified that the parties filed joint tax returns as a married couple until 2008, but that in 2009 and 2010, the parties' tax status was changed to married, filing separately.

Testimony during trial established that plaintiff utilized at least some of the LLCs as the vehicle to purchase and convey numerous real estate holdings. In addition, the marital home, which plaintiff owned before the marriage, was conveyed to one of the LLCs. Plaintiff asserted below that defendant never incurred any liability as the result of the obligations arising from these multiple transactions, and that, as required by the antenuptial agreement, defendant signed warranty deeds when properties were sold to release any dower rights she might have acquired.[4] However, despite contending that defendant willfully released her dower rights in accordance with the terms of the antenuptial agreement, plaintiff also asserted that defendant never gained any ownership interest in any of the properties.

After more than 16 years of marriage, plaintiff filed for divorce on July 28, 2010. On July 13, 2011, plaintiff filed a second[5] motion for partial summary disposition regarding the antenuptial agreement. Plaintiff argued that the antenuptial agreement governed and was dispositive of all issues except for custody, parenting time, and child support. Plaintiff attached as evidentiary support for his motion: the September 9 antenuptial agreement, the deposition of John Carlisle, the deposition of Brian Carrier,[6] and the affidavit of Sherrie Doucette.[7] At the

---

[2] From our review of the record, it appears most if not all of the LLCs were formed prior to 2009.

[3] "As a 'disregarded entity,' a single-member LLC is not taxed separately, but has its income attributed to its owner and the owner is then responsible for paying all taxes due." *Kmart Mich Prop Services, LLC v Dep't of Treasury*, 283 Mich App 647, 652; 770 NW2d 915 (2009).

[4] Defendant argued at trial that she never signed any deeds, and that her signature was forged. Plaintiff disputed this testimony, and offered contrary testimony in addition to identifying the signatures on the deeds as defendant's signature.

[5] Plaintiff first moved for partial summary disposition under MCR 2.116(C)(4), (7), and (10). While the trial court denied the motion with prejudice with respect to MCR 2.116(C)(4) and (7), it denied the motion with respect to MCR 2.116(C)(10) without prejudice. The trial court explained that plaintiff failed to submit "any supporting affidavits, deposition transcripts, admissions, or other documentary evidence."

[6] Carrier worked in Carlisle's office and was the person who notarized the antenuptial agreement on September 9, 1993.

[7] Doucette worked in Carlisle's office and was one of the witnesses who signed the antenuptial agreement on September 9, 1993.

August 8, 2011 motion hearing, plaintiff also introduced the deposition testimony of defendant. Defendant responded to the motion by arguing that the agreement was void because the terms of the agreement were unconscionable, defendant did not have the benefit of independent counsel, and also because the agreement was signed under duress on the day of the wedding rehearsal. Defendant also contended that a change of circumstances supported the setting aside of the agreement, asserting that the facts would show she was abused by plaintiff during the marriage and that plaintiff never intended to create a marital partnership. In support of her response opposing the motion, defendant submitted her own affidavit and plaintiff's deposition.

The trial court granted plaintiff's motion. First, the trial court determined that defendant could not establish that the contract was signed under duress because there was no evidence of any illegal action. Next, the trial court determined that the agreement was not unconscionable because its terms did not shock the conscious of the court. Last, the trial court found that there was no change of circumstances that would make enforcement of the contract unfair and unreasonable. In particular, the trial court noted that the length of a marriage and the growth of assets are not unforeseeable and therefore cannot qualify as a change of circumstances. Further, the trial court questioned the validity of defendant's claim of abuse because, as far as the trial court was concerned, it was raised at the "eleventh hour," but regardless, noted that the allegation on its face would not "rise to the level of rendering th[e] contract unenforceable." Finally, the trial court found defendant's argument—that plaintiff's lack of intent to create a marital partnership was unforeseeable—unpersuasive, noting that the clear language of the agreement allows for each spouse to maintain separate assets.

Subsequently at trial, defendant argued that aside from the plain language of the antenuptial agreement as interpreted by the trial court, she should be able to "invade" plaintiff's personal assets based on a partnership theory. The trial court ultimately rejected this argument. The trial court also concluded "that the equitable distribution factors contemplated by MCL 552.19 and set forth in *Sparks v Sparks*, 440 Mich 141, 159-62[; 485 NW2d 893] (1992) were not applicable" because of the presence of the unambiguous antenuptial agreement. Further, the trial court declined defendant's invitation to invade plaintiff's personal assets under the guise of MCL 552.23(1) or MCL 552.401. The court explained that if it allowed such an invasion to take place, then the right to freely contract would be jeopardized. As a result, the focus of the bench trial was to determine who owned what assets.

The record is clear that all of the assets of worth were titled in either plaintiff's name, one of plaintiff's LLCs' names, or defendant's name. As such, the trial court concluded that there was little marital property to distribute. Consequently, pursuant to the antenuptial agreement, the trial court awarded plaintiff the six LLC entities, the stock he owned, and "all bank accounts presently titled in his name alone or titled in the name of his single-member LLCs." The trial court awarded defendant the stock she owned, an IRA account that was in her name, and all bank accounts that were in her name. The value of the assets awarded to plaintiff was in excess of $900,000, while the assets awarded to defendant were valued at approximately $95,000.

Because the antenuptial agreement prohibited the award of any spousal support, the trial court did not award any. And, although not pertinent to any issue on appeal, the parties reached agreement on the issues of custody and parenting time, and this agreement was incorporated in the judgment of divorce entered by the trial court.[8]

With regard to child support, the trial court used the Michigan Child Support Formula to calculate the base child support to be $3,041 a month for both children. However, the trial court also determined that the application of the formula would be both unjust and inappropriate and, therefore, not in the children's best interests. Consequently, the trial court increased the base monthly child support award by $1,000.

II

A

We first address defendant's arguments that the antenuptial agreement was void, and therefore unenforceable. We disagree.

A trial court's decision on a motion for summary disposition brought under MCR 2.116(C)(10) is reviewed de novo. *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003). When deciding a motion for summary disposition under this rule, a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence then filed in the action or submitted by the parties in the light most favorable to the nonmoving party. MCR 2.116(G)(5); *Wilson v Alpena Co Rd Comm*, 474 Mich 161, 166; 713 NW2d 717 (2006). The motion is properly granted if the evidence fails to establish a genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. *Michalski v Bar-Levav*, 463 Mich 723, 730; 625 NW2d 754 (2001).

In Michigan, antenuptial agreements "may be voided (1) when obtained through fraud, duress, mistake, or misrepresentation or nondisclosure of a material fact, (2) if it was unconscionable when executed, or (3) when the facts and circumstances are so changed since the agreement was executed that its enforcement would be unfair and unreasonable." *Reed v Reed*, 265 Mich App 131, 142-143; 693 NW2d 825 (2005). The party challenging the validity of an antenuptial agreement carries the burden of proof and persuasion. *Id.* at 143.

1

"To determine if a prenuptial agreement is unenforceable because of a change in circumstances, the focus is on whether the changed circumstances were reasonably foreseeable either before or during the signing of the prenuptial agreement." *Woodington v Shokoohi*, 288 Mich App 352, 373; 793 NW2d 63 (2010). Like she argued at the trial court, defendant on appeal claims that she was abused during the marriage, which she claims constituted an unforeseen

---

[8] The parties were awarded joint legal custody, defendant was awarded primary physical custody, and plaintiff was awarded reasonable parenting time.

change of circumstances that would make enforcement of the antenuptial agreement unreasonable. We disagree.

In response to plaintiff's second motion for partial summary disposition, defendant submitted an affidavit, where she claimed that she was the victim of verbal and physical abuse during the course of the marriage. But defendant has provided no case law that supports her position that someone's "fault" in a divorce can constitute an unforeseen change in circumstances. While "fault" is a factor that courts generally consider in awarding spousal support, *Berger v Berger*, 277 Mich App 700, 726-727; 747 NW2d 336 (2008), and dividing the marital property, *Sparks*, 440 Mich at 158-160, the parties implicitly agreed in their antenuptial agreement that fault would not be a factor in these determinations. Thus, to invalidate the agreement on the basis of one party's fault would contravene the clear and unambiguous language of the agreement.

Moreover, even assuming that the abuse occurred and was unforeseeable, this change in circumstances is not sufficient to void the parties' antenuptial agreement in this instance. The types of changes of circumstances that may void an otherwise valid antenuptial agreement must relate *to the issues addressed in the antenuptial agreement*. Since the primary focus of the antenuptial agreement addressed spousal support and the division of the parties' assets, any changes of circumstances must relate to these aspects, and here, the domestic abuse does not. See *Justus v Justus*, 581 NE2d 1265, 1273 (Ind App, 1991) (while reviewing how other jurisdictions have addressed a change of circumstances after the execution of an antenuptial agreement, the court concluded that courts "may decline to enforce an antenuptial agreement, but only where enforcement would leave a spouse in the position where he would be unable to support himself. At that point, the state's interest in not having the spouse become a public charge outweighs the parties' freedom to contract.").

Defendant's reliance on *Hutchison v Hutchison*, unpublished opinion per curiam of the Court of Appeals, issued July 28, 2009 (Docket No. 284259) for the proposition that abuse may play a role in constituting a change of circumstances is misplaced. Although unpublished opinions are not binding precedent, we may consider them for their persuasive value. MCR 7.215(C)(1); *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 145 n 3; 783 NW2d 133 (2010). In *Hutchison*, this Court affirmed the trial court's determination that the parties' antenuptial agreement was unenforceable because of a change of circumstances. While the Court noted that the defendant suffered years of mental and physical abuse, it also noted that, when the plaintiff retired, he insisted that the defendant quit her employment and threatened that he would make her life miserable if she did not comply. *Hutchison*, unpub op at 2. Thus, *Hutchison* does not stand for the proposition that abuse, alone, can constitute a sufficient change of circumstances to void an otherwise valid antenuptial agreement. Instead, it was important that the plaintiff's unforeseen actions prohibiting the defendant from working directly impacted the defendant's financial situation. In the present case, there was no evidence that plaintiff's alleged abuse affected defendant's ability to earn income or affected any of her property rights. She testified at her deposition that plaintiff never told her she could not work. She also stated that she chose to not seek employment after leaving the work force because plaintiff earned enough to take care of the family. Accordingly, we hold that, as a matter of law, defendant failed to show that a change of circumstances was sufficient to void the antenuptial agreement.

Defendant also argues that the trial court erroneously made credibility findings at the summary disposition phase. Defendant is correct that a trial court is precluded from making any findings of fact or credibility determinations during summary disposition. *Moon v Mich Reproductive & IVF Center, PC*, 294 Mich App 582, 595; 810 NW2d 919 (2011). Although the trial court appeared to impermissibly weigh defendant's credibility related to her allegations of abuse,[9] it also noted that it, even assuming the allegations were true, it failed to see how the existence of any abuse was *relevant*. Because the trial court correctly determined that evidence of abuse was not a relevant consideration as it pertained to defendant's claimed change of circumstances, any error introduced by the trial court also potentially discounting the evidence as being less-than-credible was harmless. See *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004).

2

A contract may be deemed unenforceable if it was executed under duress. *Liparoto Constr, Inc v General Shale Brick, Inc*. 284 Mich App 25, 30; 772 NW2d 801 (2009). "[T]o succeed with respect to a claim of duress, [defendants] must establish that they were illegally compelled or coerced to act by fear of serious injury to their persons, reputations, or fortunes." *Farm Credit Servs of Mich's Heartland, PCA v Weldon*, 232 Mich App 662, 681; 591 NW2d 438 (1998) (quotation marks omitted and alteration in original); see also *Norton v State Hwy Dep't*, 315 Mich 313, 320; 24 NW2d 132 (1946). Further, the "[f]ear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully. *Weldon*, 232 Mich App at 681 (quotation marks omitted). Defendant claims on appeal that Michigan's definition of duress is unclear and that the "unlawful" aspect should be removed. We disagree. First, the definition is quite clear and needs no clarification. Second, defendant's argument tacitly acknowledges that the definition is indeed clear because she then argues that this Court should remove the definition's key component. Moreover, even if we were inclined to agree with defendant, we are bound by the doctrine of stare decisis and have no power to modify this Court's and our Supreme Court's prior definition of duress by removing its illegal or unlawful component. MCR 7.215(C)(2); *W A Foote Mem Hosp v City of Jackson*, 262 Mich App 333, 341; 686 NW2d 9 (2004).

At the trial court, defendant never suggested that any unlawful or illegal coercion took place when she signed the antenuptial agreement. As she stated in her deposition, she explained that she felt under "duress" because the agreement was executed on the day of the rehearsal dinner for the wedding. She was concerned that, if she did not sign the agreement, then the wedding would be called off and 150 wedding guests would have to be notified. She also explained her fear of losing deposits and payments associated with the wedding and that "[i]t

---

[9] The trial court expressed its skepticism of the veracity of defendant's claim of abuse because she was raising it for the first time in response to plaintiff's second motion for partial summary disposition: "And the fact that this [the allegation of abuse] was raised at the eleventh hour does cause some concern to this court. This is the second motion for summary disposition on this issue, and this was never raised beforehand."

was money I couldn't afford to lose at the time." These facts do not support the conclusion that anyone engaged in any illegal or unlawful acts to coerce defendant to sign the antenuptial agreement, and defendant's "[f]ear of financial ruin alone is insufficient to establish economic duress." *Weldon*, 232 Mich App at 681 (quotation marks omitted). Therefore, because defendant never offered any evidence of any illegal behavior, her claim of duress is without merit, and the trial court correctly determined that she could not prevail on this issue as a matter of law.

3

An unconscionable contract is not enforceable. "In order for a contract or contract provision to be considered unconscionable, both procedural and substantive unconscionability must be present." *Clark v DaimlerChrysler Corp*, 268 Mich App 138, 143; 706 NW2d 471 (2005).

> Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term. If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability. Substantive unconscionability exists where the challenged term is not substantively reasonable. However, a contract or contract provision is not invariably substantively unconscionable simply because it is foolish for one party and very advantageous to the other. Instead, a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience. [*Id.* at 144 (citations omitted).]

Here, there was no evidence that there was any procedural unconscionability. On appeal, defendant relies on her characterization that plaintiff timed the signing of the agreement "perfectly" on the day of the rehearsal dinner. But in her affidavit, she admitted that she received a draft of the agreement 10 days before the wedding. Plus, she testified in her deposition that she had time to consult with her father regarding the antenuptial agreement. Moreover, defendant admitted that during her meeting with plaintiff and his attorney, a term of the agreement was modified because of a concern she had regarding what would happen in the event plaintiff died during the marriage. In sum, the evidence is not sufficient to establish that there was any procedural unconscionability.

Likewise, there was no evidence that there was any substantive unconscionability. Defendant relies on the disparate outcome after enforcing the agreement. But that is not the proper focus. Instead, courts must look to the *terms* of a contract itself. See *id.* On appeal, defendant fails to identify any specific terms of the agreement that she deems to be unconscionable. But our review of the agreement's terms shows that they are neutral. For instance, the agreement provided that "[e]ach party shall during his or her lifetime keep and retain sole ownership, control, and enjoyment of all real, personal, intangible, or mixed property now owned, free and clear of any claim by the other party." It also provided that in the event of divorce, the marital assets would be divided equally between the parties and that "[a]ny property acquired in either party's individual capacity or name during the marriage . . . shall remain the sole and separate property of the party named on the account or the party who acquired the

property in his or her individual capacity or name." Thus, it is clear that the terms of the agreement were neutral with respect to the parties, and they do not "shock the conscious."

Therefore, the trial court did not err in concluding that, as a matter of law, that the antenuptial agreement was enforceable. There was no change of circumstances that made its enforcement unfair and unreasonable; the agreement was not signed under duress; and the agreement itself was not unconscionable.

B

Because we conclude that the parties' antenuptial agreement was enforceable, we turn our attention to defendant's other arguments. Defendant also argues that the trial court erred in failing to give any consideration to dividing the parties' property pursuant to MCL 552.23 and 552.401. We disagree. This Court reviews the proper interpretation and application of statutes de novo. *Brecht v Hendry*, 297 Mich App 732, 736; 825 NW2d 110 (2012).

A determination of the parties' property rights must be included in a judgment of divorce. MCR 3.211(B)(3); *Olson v Olson*, 256 Mich App 619, 627; 671 NW2d 64 (2003). The goal in distributing marital assets is to make the distribution fair and equitable in light of all the circumstances of the case. *McNamara v Horner*, 249 Mich App 177, 183, 188; 642 NW2d 385 (2002). Only the marital estate—not the spouses' separate estates—is the subject of the property division. *Woodington*, 288 Mich App at 358; *Korth v Korth*, 256 Mich App 286, 291; 662 NW2d 111 (2003); *Reeves v Reeves*, 226 Mich App 490, 494; 575 NW2d 1 (1997). However, generally, assets earned by one spouse during the marriage are nonetheless considered part of the marital estate. *Korth*, 256 Mich App at 291. When dividing the marital estate, trial courts may consider the following factors:

> (1) the duration of the marriage, (2) the contributions of the parties to the marital estate, (3) the age of the parties, (4) the health of the parties, (5) the life situation of the parties, (6) the necessities and circumstances of the parties, (7) the parties' earning abilities, (8) the parties' past relations and conduct, and (9) general principles of equity. [*Berger*, 277 Mich App at 717.]

In Michigan, parties may enter into antenuptial agreements to govern the distribution of property in the event of divorce. *Rinvelt v Rinvelt*, 190 Mich App 372, 382; 475 NW2d 478 (1991). The Court in *Reed* stated the following:

> Antenuptial agreements are subject to the rules of construction applicable to contracts in general. Antenuptial agreements, like other written contracts, are matters of agreement by the parties, and the function of the court is to determine what the agreement is and enforce it. Clear and unambiguous language may be [sic] not rewritten under the guise of interpretation; rather, contract terms must be strictly enforced as written, and unambiguous terms must be construed according to their plain and ordinary meaning.

-10-

\* \* \*

> Prenuptial agreements . . . provide . . . people with the opportunity to ensure predictability, plan their future with more security, and, most importantly, decide their own destiny.

\* \* \*

> In sum, both the realities of our society and policy reasons favor judicial recognition of prenuptial agreements. . . . [W]e see no logic or compelling reason why public policy should not allow two mature adults to handle their own financial affairs. Therefore, we join those courts that have recognized that prenuptial agreements legally procured and ostensibly fair in result are valid and can be enforced. [*Reed*, 265 Mich App at 144-145 (quotation marks and citations omitted; alternations in original).]

The overriding principle is that "parties who negotiate and ratify antenuptial agreements should do so with the confidence that their expressed intent will be upheld and enforced by the courts." *Id.* at 145.

In this case, there is an antenuptial agreement that unambiguously provides that "[a]ny property acquired in either party's individual capacity or name during the marriage . . . shall remain the sole and separate property of the party named on the account or the party who acquired the property in his or her individual capacity or name." Nevertheless, defendant claims that the trial court incorrectly refused to consider dividing the property instead pursuant to MCL 552.23(1) and MCL 552.401.

As explained earlier, each party in a divorce is generally entitled to retain their own separate estate without invasion by the other party. *Reeves*, 226 Mich App at 494. "However, a spouse's separate estate can be opened for redistribution when one of two statutorily created exceptions is met." *Id.*

"The first exception to the doctrine of noninvasion of separate estates is found in MCL 552.23. Subsection 1 of this statue permits invasion of the separate estates if after division of the marital assets 'the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party.'"[10] *Id.*, quoting MCL 552.23. This simply means that invasion is allowed when one party demonstrates additional need. *Id.*

---

[10] MCL 552.23(1) provides:

> Upon entry of a judgment of divorce or separate maintenance, if the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party and any children of the marriage who are committed to the care and custody of either party, the court may also award to either party

"The other statutorily granted method for invading a separate estate is available only when the other spouse 'contributed to the acquisition, improvement, or accumulation of the property.'" *Id.* at 494-495, quoting MCL 552.401.[11] In other words, "[w]hen one significantly assists in the acquisition or growth of a spouse's separate asset, the court may consider the contribution as having a distinct value deserving of compensation." *Id.* at 495.

We disagree with defendant's assertions that these statutes allow a party to invade the other spouse's separate estate contrary to the terms of a valid antenuptial agreement. The only prior Michigan case that references this type of interaction between the statutes at issue and a valid antenuptial agreement is *Reed*. In *Reed*, the parties antenuptial agreement provided that "each party shall have complete control of his or her separate property, and may enjoy and dispose of such property in the same manner as if the marriage had not taken place. The foregoing shall apply to all property now owned by either of the parties and to all property which may hereafter be acquired by either of them in an individual capacity." *Reed*, 265 Mich App at 146. On appeal, the defendant in *Reed* argued, *inter alia*, that property he purchased in Oakland County as well as some Malcolm X papers he purchased were erroneously considered part of the marital estate, in contravention of the antenuptial agreement. This Court agreed and stated the following:

> All of the Oakland County property, as well as the Malcolm X papers, is excluded from the marital estate by the prenuptial agreement. Although the testimony and documents defendant presented regarding this property were less than credible, it is undisputed that defendant acquired this property either in his individual capacity or through one of the entities he controlled. Accordingly, the trial court clearly erred by including this property in the marital estate *without factual findings that one of the two statutory exceptions permitting invasion of separate property was applicable*. [*Id.* at 156 (emphasis added).]

> the part of the real and personal estate of either party and spousal support out of the real and personal estate, to be paid to either party in gross or otherwise as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all the other circumstances of the case.

[11] MCL 552.401 provides:

> The circuit court of this state may include in any decree of divorce or of separate maintenance entered in the circuit court appropriate provisions awarding to a party all or a portion of the property, either real or personal, owned by his or her spouse, as appears to the court to be equitable under all the circumstances of the case, if it appears from the evidence in the case that the party contributed to the acquisition, improvement, or accumulation of the property. The decree, upon becoming final, shall have the same force and effect as a quitclaim deed of the real estate, if any, or a bill of sale of the personal property, if any, given by the party's spouse to the party.

We first note that the emphasized portion above is dicta. "Obiter dictum" has been defined as "a judicial opinion in a matter related but not *essential* to a case." *Allison v AEW Capital Management, LLP*, 481 Mich 419, 437; 751 NW2d 8 (2008) (emphasis added). The *Reed* Court earlier in its opinion concluded that the trial court erred by failing to enforce the antenuptial agreement. *Reed*, 265 Mich App at 141, 149. As a result, it is clear from the opinion that the trial court was reversed, not because it failed to apply one of the statutory exceptions, but because it failed to enforce the plain language of the antenuptial agreement. In short, the Court's reference to "the two statutory exceptions" was not essential to the resolution of the issue before it because it already had decided that the trial court failed to enforce the antenuptial agreement. Therefore, we find mere dicta and not binding that portion of Court's opinion which implied that, despite contrary language contained in a valid antenuptial agreement, both MCL 552.23(1) and MCL 552.401 permit a spouse to invade the other spouse's separate estate. *People v Peltola*, 489 Mich 174, 190 n 32; 803 NW2d 140 (2011).

Secondly, and perhaps more importantly, MCL 557.28 unambiguously provides that "[a] contract relating to property made between persons in contemplation of marriage shall remain in full force after marriage takes place." To the extent that it could be argued that MCL 557.28 is ambiguous, "[s]tatutes that relate to the same subject or that share a common purpose are *in pari materia* and must be read together as one law, even if they contain no reference to one another and were enacted on different dates." *Mich Deferred Presentment Servs Ass'n, Inc v Comm'r of the Office of Fin & Ins Regulation,* 287 Mich App 326, 334; 788 NW2d 842 (2010) (citation and quotations omitted). Clearly, MCL 557.28, MCL 552.23(1) and MCL 552.401 all relate to the division of property in a divorce action, and therefore, must be read together and as consistent with each other. We therefore reject defendant's contention that MCL 552.23(1) and MCL 552.401 required the trial court to disregard the antenuptial agreement in determining an equitable division of property.

C

Defendant next argues that the trial court erred in finding that all of the property that plaintiff acquired during the marriage was acquired as his separate estate rather than as part of the marital estate. We agree.

A trial court's findings of fact made following a bench trial in a divorce action are reviewed for clear error. *McNamara v Horner (After Remand)*, 255 Mich App 667, 669; 662 NW2d 436 (2003). "A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id.* This issue also necessarily involves the interpretation of the antenuptial agreement, which is a question of law that this Court reviews de novo. *Reed*, 265 Mich App at 141.

As we previously explained, assets acquired, and income earned, during the course of a marriage are generally to be considered part of the marital estate. MCL 552.19; *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010); see also *Reed,* 265 Mich App at 151–152. An exception to this general principal, again as we have already discussed, is that the unambiguous terms of a valid antenuptial agreement are to be enforced. MCL 557.28; *Reed*, 265 Mich App at 141; see also *Woodington*, 288 Mich App at 372 ("A court should never disregard a

-13-

valid prenuptial agreement, but should instead enforce its clear and unambiguous terms as written."). The tension evoked by the collision between these two conflicting and apparently controlling principles of law is resolved by the law's ultimate recognition that "[t]he mere fact that property may be held jointly or individually is not necessarily dispositive of whether the property is classified as separate or marital. *Cunningham*, 289 Mich App at 201-202 (internal quotation marks and citations omitted). In other words, the facts developed in the record determine whether the named classification of property and other assets should be honored by the court when the assets of the parties are divided.

Again, the salient portions of the parties' antenuptial agreement as it concerns the division of assets provide:

> 5.     In the event that the marriage . . . terminate[s] as a result of divorce, then, in full satisfaction, settlement, and discharge of any and all rights or claims of alimony, support, property division, or other rights or claims of any kind, nature, or description incident to marriage and divorce (including any right to payment of legal fees incident to a divorce), under the present or future statutes and laws of common law of the state of Michigan or any other jurisdiction (all of which are hereby waived and released), the parties agree that all property acquired after the marriage between the parties shall be divided between the parties with each party receiving 50 percent of the said property. However, notwithstanding the above, the following property acquired after the marriage will remain the sole and separate property of the party acquiring the property and/or named on the property:
>
> a.     As provided in paragraph Two and Three of this antenuptial agreement, any increase in the value of any property, rents, profits, or dividends arising from property previously owned by either party shall remain the sole and separate property of that party.
>
> b.     Any property *acquired in either party's individual capacity or name* during the marriage, including any contributions to retirement plans (including but not limited to IRAs, 401(k) plans, SEP IRAs, IRA rollovers, and pension plans), shall remain the sole and separate property of the party named on the account or the party who acquired the property in his or her individual capacity or name.
>
> * * *
>
> 8.     Each party shall, without compensation, join as grantor in any and all conveyances of property made by the other party or by his or her heirs, devises, or personal representatives, thereby relinquishing all claim to the property so conveyed, including without limitation any dower or homestead rights, and each party shall further, upon the other's request, take any and all steps and execute, acknowledge, and deliver to the other party any and all further instruments necessary or expedient to effectuate the purpose and intent of this agreement.

-14-

* * *

10.     Each party acknowledges that the other party has advised him or her of the other party's means, resources, *income*, and the nature and extent of the other party's properties and holdings (including, but not limited to, the financial information set forth in exhibit A attached hereto and incorporated herein by reference) and that there is a likelihood for substantial appreciation of those assets subsequent to the marriage of the parties. [Emphasis added.]

The trial court concluded that, given the plain and unambiguous language of the antenuptial agreement in which the parties agreed to waive "all rights and claims" to property division under statute or common law, to evenly divide whatever existed of the marital estate, and to keep his or her own separate estate, all it was required to do was determine which property was in the name of which party in order to distribute the assets according to the agreement. This was error.

First, defendant agreed to forgo her claim to an equitable division of the *property*[12] plaintiff acquired in his individual capacity or name. The testimony presented during the trial, however, was that much of the real estate acquired during the course of the marriage was acquired in the name of the various LLCs formed by plaintiff during the course of the marriage. A limited liability company exists as an independent legal entity, and as such, can own assets and enter into contracts, is liable for its own debts, and cannot be held automatically liable for the debts of another separate legal entity. MCL 450.4210. Moreover, a member of a limited liability company "is not liable for the acts, debts, or obligations of the limited liability company." MCL 450.4501(4). Michigan courts generally recognize the principle that separate entities will be respected. *Wells v Firestone Tire & Rubber Co,* 421 Mich 641, 650; 364 NW2d 670 (1984). We conclude, therefore, that as a matter of law, the LLCs created during the course of the marriage are separate legal entities and *not* to be construed, for purposes of interpreting and applying the plain and unambiguous terms of this antenuptial agreement, as being the same as plaintiff "in his individual capacity or name." Thus, to the extent any real estate properties or other assets were acquired during the course of the marriage by the various LLCs created during the marriage, we find that their disposition in this divorce action is *not* governed by the antenuptial agreement.

Second, the antenuptial agreement does not treat the income earned by the parties during the marriage as separate property. Whereas paragraph 5.b. of the antenuptial agreement specifically refers to "property," inclusive of retirement plans, paragraph 10 discusses the parties' "means, resources, income, and …properties." Thus, the specific mention of income in section 10 of the antenuptial agreement and the absence of its mention in section 5 is deemed to be intentional. *Hackel v Macomb County Comm*, 298 Mich App 311, 324; 826 NW2d 753 (2012) ("[T]he doctrine of expressio unius est exclusio alterius, or inclusion by specific mention excludes what is not mentioned."); see also *In re AJR*, 300 Mich App 597, 600; 834 NW2d 904 (2013) ("this Court may not ignore the omission of a term from one section of a statute when that

---

[12] As we will discuss hereafter, the antenuptial agreement does not define property to also mean income.

term is used in another section of the statute. ")  If the parties had intended that income and property were to be treated as synonymous terms, they would have so specified in the body of the antenuptial agreement.  Thus, we conclude as a matter of law that all income earned by the plaintiff during the course of the marriage should have been treated by the trial court as marital income that was part of the marital estate, subject to an appropriate dispositional ruling. *Cunningham*, 289 Mich App at 201.  The trial court made no findings concerning the extent of marital income earned by plaintiff, and thus remand is required for further development of the record on this question.

While the record is insufficient for us to make definitive rulings regarding the extent of plaintiff's earnings to be treated as marital income, we can and do note, by way of example, that the joint tax returns filed by the parties in 2005 and 2006 claimed, respectively, $89,000 and $113,000 in earned business income, with no wages earned by the parties, and that plaintiff's 2010 tax returns show business income in excess of $200,000 attributable to the LLCs, and $21,000 in wages.  "Business income means all income arising from transactions, activities, and sources in the regular course of the taxpayer's trade or business . . . ."  MCL 206.4. The record reveals that, as of March 2011, during the pendency of the divorce proceedings, plaintiff incurred in excess of $5,600 a month in expenses for such items as the mortgage, taxes, insurance and outside maintenance on the marital home (which was classified as an asset of one of the LLCs), defendant's personal credit card bill, cable, utilities, water, telephone, defendant's car note and insurance, and health and life insurance.  The fact that plaintiff incurred nearly $68,000 (on an annualized basis) in what can be characterized as personal expenses between 2010 and 2011, despite filing tax returns showing only $21,000 in wages for 2010, and no wages in 2005 and 2006, calls into question whether income treated by plaintiff, and accepted by the trial court, as business income generated by the LLCs should be treated instead as marital income subject to division.  We recognize that plaintiff testified he received up to $20,000 in annual cash gifts from his father, and further that his father loaned him funds, which plaintiff may have used for various personal expenses.  However, the record is unclear on these points, and given its erroneous interpretation of the antenuptial agreement, the trial court made no findings on these questions.

Moreover, if the evidence was to demonstrate that marital income was used in whole or in part by the LLCs to purchase the various real estate holdings and other assets acquired by the LLCs during the course of the marriage, the commingling of marital and separate income may have caused the assets to become part of the marital estate, and thus, subject to equitable division by the trial court. *Cunningham*, 289 Mich App at 201, quoting *Pickering v Pickering*, 268 Mich App 1, 11; 706 NW2d 835 (2005) (Separate assets also "transform into marital property if they are commingled with marital assets and 'treated by the parties as marital property.' ").  Because the trial court erred in interpreting the antenuptial agreement such that, so long as a property was titled in the name of an LLC, an in depth inquiry into the source of the funds used to purchase the various real estate holdings of the LLCs was precluded, remand is required in order for the trial court to receive additional evidence and make findings on these questions.

In connection with our remand of this matter, we take care to note that "[t]he rules regarding piercing a corporate veil are applicable in determining whether to pierce the corporate veil of a limited liability company." *Florence Cement Co v Vettraino*, 292 Mich App 461, 468-469; 807 NW2d 917 (2011).  Piercing the corporate veil of a limited liability company is permissible where there is evidence that the corporate entity (1) is a mere instrumentality of

another individual or entity, (2) was used to commit a wrong or a fraud, and (3) caused an unjust injury or loss. *Id.*

IV

In conclusion, we find that the antenuptial agreement between the parties is valid and enforceable, that under the plain and unambiguous language of the antenuptial agreement, the LLCs created by plaintiff during the course of the marriage were not acquired in plaintiff 's individual capacity or name, that under the plain and unambiguous language of the antenuptial agreement, the income of the parties is to be treated as marital income and not property subject to division as separate property, and that remand is required for further action by the trial court consistent with this opinion, particularly a determination regarding the extent to which income earned by plaintiff and derived from the LLCs should be treated as marital income, and whether that marital income was utilized to purchase assets titled to the LLCs.

Affirmed in part, reversed in part, and remanded for further proceedings. Neither party having prevailed in full, no costs are taxed. MCR 7.219. We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Michael J. Kelly
/s/ Karen M. Fort Hood