# STATE OF MICHIGAN

# COURT OF APPEALS

---

CYNTHIA HOBBS,

      Plaintiff-Appellee/Cross-Appellant,

v

RAYMOND HOBBS,

      Defendant-Appellant/Cross-
      Appellee.

UNPUBLISHED
February 14, 2017

No. 325835
Washtenaw Circuit Court
LC No. 13-000103-DO

---

Before: SAWYER, P.J., and HOEKSTRA and WILDER, JJ.

PER CURIAM.

In this appeal and cross-appeal involving an antenuptial agreement, the parties[1] appeal as of right the trial court's entry of a divorce judgment following a bench trial. We affirm in part and remand for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURE

The parties met in 1994 and dated for four years before marrying in 1998. Several months before the wedding, Raymond informed Cynthia of his desire that they enter an antenuptial agreement. He provided her with a draft agreement roughly one month before the scheduled wedding, which Cynthia reviewed and discussed with an attorney. Several days before the wedding, Raymond presented Cynthia with a final draft, which both parties executed. In pertinent part, the executed antenuptial agreement provided as follows:

> B.     We mutually desire to define our financial rights and responsibilities with respect to each other.
>
> C.     Each of us intends, by entering into this agreement, to limit the right of the other to participate in our separate estates in the event that our future marriage is terminated by death, divorce, separate maintenance, or annulment.
>
> D.     Each of us has fully disclosed to the other all of our assets and liabilities.

---

[1] For the sake of clarity, we will refer to the parties by their first names.

-1-

* * *

G.    [Cynthia] represents that she is 48 years of age (date of birth January 14, 1950) and [Raymond] represents that his is 45 years of age (date of birth December 2, 1952).

H.    Both parties represent that they are in good health.

* * *

In consideration of the mutual promises in this agreement and our forthcoming marriage, we agree:

1.    ASSETS AND LIABILITIES. [The parties'] individual financial summaries have been attached to this agreement as Exhibits "A" and Exhibit "B", respectively. Our summaries are intended to be reasonable approximations, but not precise delineations. The representations each of us has made in the summaries constitute full disclosure of our financial situations, subject only to the caveat that the summaries were prepared informally.

2.    PREMARITAL PROPERTY. With respect to all property owned by us in our individual names prior to our marriage:

a) Premarital Property Shall Remain Separate Property. Except as we have explicitly provided elsewhere in this agreement, we agree that all property described in the attached summaries of separate property shall remain as separate property. In addition, the tangible personal property (which is not itemized on the attached Exhibits) owned by each of us shall remain as separate property.

* * *

b) Premarital Retirement Plans. Any retirement benefits owned by either of us at the time of the marriage shall remain separate property.

* * *

3.    PROPERTY ACQUIRED AFTER MARRIAGE.

a) Property Acquired by Gift or Inheritance. Any property which either of us acquires individually by reason of gift or inheritance after our marriage, shall be deemed the separate property of that party.

b) Earned Income. Any income earned during the marriage from employment, including wages, salaries, commissions, royalties, overtime, and similar payments, and including income from sources such as self-

employment, partnerships, close corporations, and independent contracts, shall be deemed marital property of the parties.

c) <u>Unearned Income</u>.  Except as we have explicitly provided elsewhere in this agreement, any unearned income received during the marriage from separate property, including income from investments, appreciation, dividends, interest, or from passive or active property ownership, shall be separate property.  Any unearned income received during the marriage from marital assets, including income from investments, appreciation, dividends, interest, or from passive or active property ownership, shall be marital property.

d) <u>Retirement Plans</u>.  Any contributions to qualified or unqualified pension, profit-sharing or other retirement plans during the marriage, and earnings on such contributions, shall be marital property.  Post-marital earnings and growth in the value of premarital retirement plans shall be separate property. [Raymond] may, but is not required to, switch his deferred compensation account from Fidelity Investments to TIAA CREF after the marriage to segregate his post marital retirement savings.  In any event he shall retain records to document the post marital contributions and earnings/growth on those contributions.

e) <u>Property Purchased with Marital Funds</u>.  Any property of any nature which is purchased with marital funds shall be marital property.  The proceeds resulting from the sale of such assets shall be marital property.

f) <u>Property Purchased with Separate Funds</u>.  Any property purchased with separate funds shall be deemed separate property unless:

> *i*) it is titled in the parties' joint names with survivorship rights, in which case it shall be considered marital property; or

> *ii)* the parties have agreed in writing to deem it marital property.

*   *   *

7.    <u>UPON DISSOLUTION OF MARRIAGE</u>.  In the event of the dissolution of our marriage by divorce, separate maintenance, or annulment, we agree:

a) Marital property shall be equally divided unless the parties agree in writing otherwise.

b) All separate property shall remain as separate property, free of any claim by the other.

c) Neither of us shall seek alimony or spousal support from the other and all claims for future alimony/spousal support are waived.

* * *

14.     EFFECT. This agreement shall take effect only upon the marriage now contemplated by the parties. This agreement contains the entire understanding of the parties, and no representations or promises have been made except as contained in this agreement.

* * *

16.     VOLUNTARY AGREEMENT. The parties acknowledge that they have entered into this agreement freely and voluntarily, that they have ascertained and weighed all the facts, conditions and circumstances likely to influence their judgment in entering into this agreement, and that they clearly understand and consent to all the provisions of the agreement. [Raymond] has had legal counsel . . . and [Cynthia] has had legal counsel. . . .

According to Cynthia, in the 14 years following their wedding, Raymond became increasingly controlling and abusive. At trial, she testified as follows:

*Q.* [H]ow [we]re you and Ray[mond] relating about things when there was a disagreement?

*A.* I knew that there were not to be discussions about things. I knew that if I brought up money issues at all, I would be putting myself in harm's way.

*Q.* What do you mean by that?

*A.* If I asked about investments, Ray[mond] would go from zero to a hundred, he would start yelling, screaming obscenities. I would leave the room, try to get away from him, and go to a room, and close the door, and he would kick in the door with his leg and his foot, and come in and keep screaming at me. Screaming.

*Q.* Do you feel that you had a choice regarding those payments pertaining to the tuition [college tuition for Raymond's children that was paid with marital assets, despite the fact that Raymond indicated in premarital conversations that marital assets would not be used for it]?

*A.* No.

*Q.* And as far as the [household] expenses [paid from Cynthia's separate estate], at the point that Ray[mond] was unemployed, he had retirement money--

*A.* Yes.

*Q.* --didn't he?

-4-

*A*. Yes.

*Q*. Okay, and he also had [a separate] account from his mother, correct?

*A*. Yes.

*Q*. Could that money not have been applied toward the expenses that you folks had?

*A*. Could have been.

*Q*. Was it?

*A*. No.

*Q*. So, was this again these series of screaming and yelling, and you felt you had to make these payments?

*A*. Yes.

*Q*. Okay. Now did you talk about leaving him or leaving the marriage?

*A*. I didn't talk about leaving the marriage.

*Q*. Was there a time you talked about leaving the marriage?

*A*. No. I told him I was scared of him.

*Q*. Okay. And what was his response?

*A*. He said, if I was scared, if I was that scared of him, I could leave. Everything was his. The house was his. The money was his. Nothing was mine. Nothing was mine.

*Q*. So you could leave, but leave with nothing?

*A*. That was repeated to me countless times, countless times.

After a particularly violent incident in mid-December of 2012, Cynthia filed for divorce. In her divorce complaint, Cynthia acknowledged the existence of the antenuptial agreement, but she alleged that enforcement of that agreement "would be inequitable."

The next month, Raymond filed a motion for summary disposition under MCR 2.116(C)(8) (failure to state a claim upon which relief can be granted) and (C)(10) (no genuine issue of material fact) regarding the validity and enforceability of the antenuptial agreement. Raymond argued that (1) it was undisputed that the parties had voluntarily executed the antenuptial agreement, (2) they had done so absent any fraud, duress, mistake, or nondisclosure of material facts, (3) there had been no intervening change of fact or circumstance sufficient to

make enforcement of the antenuptial agreement inequitable, and (4) thus, the trial court was required to enforce the plain language of the antenuptial agreement.

Cynthia responded that summary disposition was inappropriate, because there remained genuine issues of material fact for resolution at trial, and argued that there had been intervening changes of circumstance that would make enforcement of the antenuptial agreement unfair. Specifically, Cynthia argued that, viewed together, Raymond's domestic violence against her, its impact on her health and ability to work, and her expenditure of her *separate* assets for *marital* expenses constituted a change of circumstances that would make enforcement of the antenuptial agreement unfair. Additionally, Cynthia argued that Raymond's motion for summary disposition was premature because discovery remained ongoing. The trial court agreed, holding that Raymond's motion for summary disposition would be denied, without prejudice, to afford the parties a chance to conduct further discovery. Raymond never renewed his motion for summary disposition.

The matter eventually proceeded to a bench trial, which spanned two days. At trial, Raymond acknowledged that he had commingled marital income with his separate, premarital assets in his University of Michigan retirement accounts. Rather than providing documentation of the exact marital contributions, and their subsequent growth, Raymond estimated that "approximately 6%" was marital. Thus, he requested division of such assets via a coverture factor.[2]

Ultimately, the trial court held that such commingling warranted treating Raymond's retirement accounts from the University of Michigan as marital assets. The trial court also decided that various portions of the parties' antenuptial agreement were invalid on several grounds:

[Cynthia] has offered evidence to support each of three grounds for invalidation.

[Raymond] delayed to the eve of the wedding to present a final form of the [ant]enuptial agreement, which did not address the notes and questions made by [Cynthia] the only time that she saw a draft of the agreement. The [ant]enuptial agreement did not disclose the extent of [Raymond]'s obligations for child and spousal support, and the schedules of pre-marital assets were incomplete. The agreement gave [Raymond] forgiveness of the debt he acknowledged to [Cynthia] as half of the down payment she made from her premarital funds. These facts all go to duress, nondisclosure, and unconscionability.

The strongest argument for invalidation, however, is the change in facts and circumstances, making enforcement unfair and unreasonable. The test is

---

[2] A coverture factor is a formula, similar to proration, used to calculate what portion of a pension or retirement account is deemed marital property and what portion is deemed separate property. See *Vander Veen v Vander Veen*, 229 Mich App 108, 112; 580 NW2d 924 (1998) ("[T]he trial court must employ a fraction of the years the parties were married while the spouse employee earned his pension over the number of years in which the employee spouse worked to build the pension benefits.").

whether the change of circumstances was foreseeable. Certainly [Cynthia] did not see that the marriage would result in her losing the majority of her pre-marital and separate assets while [Raymond] amassed a seven figure retirement portfolio. She also did not foresee that he would brutally assault her as they ate dinner one night.

In addition to the three recognized factors above is the fact that [Raymond] himself has breached the contract's requirement at 3d, which provided. . . . ["]In any event he shall retain records to document the post marital contributions and earnings/growth on those contributions.["] [Raymond] did not supply any evidence of the actual earnings/growth to determine the post-marital earnings on the pre-marital assets. He instead requested a division based on the coverture fraction, apparently abandoning any rights he had under section 3d of the [ant]enuptial agreement.

The court finds that paragraphs 3c and 3d are invalid.

For the same reasons, the trial court also held that ¶ 7c of the antenuptial agreement—"Neither of us shall seek alimony or spousal support from the other and all claims for future alimony/spousal support are waived"—was invalid. Finally, without offering any explanation or supporting factual findings, the trial court denied each party's request for attorney fees.

These appeals ensued.

## II. STANDARDS OF REVIEW

A trial court's findings of fact made following a bench trial in a divorce action are reviewed for clear error. A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with a definite and firm conviction that a mistake has been made. This issue also necessarily involves the interpretation of the antenuptial agreement, which is a question of law that this Court reviews de novo. [*Allard v Allard*, 308 Mich App 536; 867 NW2d 866 (2014), aff'd in part, rev'd in part on other grounds, vacated in part 499 Mich 932 (2016) (quotation marks and citations omitted).]

On the other hand, we review de novo a trial court's decision regarding a motion for summary disposition, *Bowden v Gannaway*, 310 Mich App 499, 503; 871 NW2d 893 (2015), and review a trial court's refusal to enforce an antenuptial agreement for an abuse of discretion, *Woodington v Shokoohi*, 288 Mich App 352, 372; 792 NW2d 63 (2010). Likewise, we review the "trial court's decision whether to award attorney fees for an abuse of discretion," reviewing its related "findings of fact for clear error, and any questions of law de novo." *Diez v Davey*, 307 Mich App 366, 395; 861 NW2d 323 (2014) (citation omitted).

### III. ANALYSIS

### A. SUMMARY DISPOSITION

Raymond argues that the trial court erred by denying his motion for summary disposition regarding the validity and enforceability of the antenuptial agreement. We disagree.

Raymond fails to recognize that the trial court's ruling was premised less on the substance of his motion than on its prematurity. "Generally, a motion for summary disposition is premature if granted before discovery on a disputed issue is complete." *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 24-25; 672 NW2d 351 (2003). "However, summary disposition may nevertheless be appropriate if further discovery does not stand a reasonable chance of uncovering factual support for the opposing party's position." *Id.* at 25.

Here, further discovery stood a reasonable chance of uncovering factual support for Cynthia's position. Notably, Raymond's motion was filed in the early stages of discovery, a mere 31 days after Cynthia's divorce complaint was filed. In response, Cynthia's counsel argued that additional discovery was necessary regarding several disputed issues. By agreeing and holding that Raymond's motion for summary disposition would be denied, without prejudice, to afford the parties a chance to conduct further discovery, the trial court did not commit error. On the contrary, the trial court pragmatically recognized that, given the dearth of discovery at that time, there was a reasonable chance that further discovery might yield factual support for Cynthia's position.

### B. ENFORCEABILITY OF THE ANTENUPTIAL AGREEMENT

Although "antenuptial agreements governing the division of property in the event of divorce are enforceable in Michigan," *Rinvelt v Rinvelt*, 190 Mich App 372, 382; 475 NW2d 478 (1991), "such agreements may be voided if certain standards of 'fairness' are not satisfied," *Reed v Reed*, 265 Mich App 131, 142; 693 NW2d 825 (2005) (quotation marks and citations omitted).

> A prenuptial agreement may be voided (1) when obtained through fraud, duress, mistake, or misrepresentation or nondisclosure of material fact, (2) if it was unconscionable when executed, or (3) when the facts and circumstances are so changed since the agreement was executed that its enforcement would be unfair and unreasonable. A party challenging a prenuptial agreement bears the burden of proof and persuasion. [*Id.* at 142-143 (quotation marks and citations omitted).]

### 1. COMMINGLED ASSETS

The trial court held that changed circumstances justified its refusal to enforce ¶ 3c and ¶ 3d of the antenuptial agreement, in which the parties agreed that *post*marital unearned income from separate property—including unearned income from *pre*marital retirement accounts—would remain separate property throughout the marriage and continue as separate property in the event of a divorce. Raymond argues that, by so ruling, the trial court committed error requiring reversal. In other words, he argues that the trial court should have divided the University of Michigan retirement accounts via a coverture factor rather than deeming them marital property and splitting them between the parties equally. We disagree.

At a fundamental, logical level, Raymond's argument regarding his University of Michigan retirement accounts is fatally flawed. Raymond contends that, by asking the trial court to divide those accounts using the applicable coverture factor, he was seeking strict enforcement of the terms of the antenuptial agreement. But that is untrue. On the contrary, the term "coverture" is conspicuously absent from the antenuptial agreement, as are any words to the same effect. Instead of calling for a coverture division of commingled retirement assets—i.e., a prorated *approximation*[3] of the proportion of the retirement accounts that were separate versus marital—the antenuptial agreement calls for an *exact* division of such marital and premarital assets.

It is undisputed that Raymond failed to exercise his option "to segregate his post marital retirement savings." Instead, after the parties married, Raymond contributed marital income to his University of Michigan retirement accounts, thereby commingling marital and separate assets within the same accounts. And yet, instead of providing the trial court with an exact accounting of the pre- and postmarital contributions (including documentation of the respective growth of such contributions), Raymond asked the trial court to divide such accounts via a coverture factor. Thus, contrary to his arguments in the trial court and on appeal, Raymond's coverture argument did *not* actually seek "enforcement" of the antenuptial agreement. Rather, he sought to have the trial court divide the University of Michigan accounts in a way that was not contemplated by the parties in their antenuptial agreement.

Consequently, Raymond's instant claim of error necessarily fails. The trial court neither could nor did commit error requiring reversal by failing to enforce provisions of the antenuptial agreement that both parties, in essence, asked that it disregard. See *Giannetti v Cornillie (On Remand)*, 209 Mich App 96, 102; 530 NW2d 121 (1995) ("[A] party cannot ask a trial court to take a certain action, and then argue on appeal that the action constitutes error."). Moreover, since neither party presented the trial court with a proposed distribution according to the actual terms of the antenuptial agreement, Raymond cannot now successfully argue that the trial court erred by failing to make such a distribution. See *Smith v Musgrove*, 372 Mich 329, 337; 125 NW2d 869 (1964) ("Error to be reversible must be error of the trial judge; not error to which the aggrieved appellant has contributed by planned or neglectful omission of action on his part.").

---

[3] Because both an employee's salary and his or her contributions to a retirement account may vary over time, proration via a coverture factor does not yield a precise division, only an estimate. See *Vander Veen*, 229 Mich App at 113-115; see also Stoller, *Estimating the Present Value of Pensions: Why Different Estimators Get Varying Results*, 2 J Legal Econ 49, 59 (1992) ("Under coverture rules, the standard calculation of the marital property proportion (i.e., coverture fraction) of the future pension benefits in defined benefit plans is very simple. It is the proportion of the time during which pension credit was being earned (prior to the evaluation date) that the couple was married. This proportion is multiplied by the estimated present value of the pension benefits, as of the evaluation date, to obtain the marital proportion of the present value. . . . [E]stimators may employ the longevity approach explained above, or, alternatively, may consider the proportion of pension fund contributions made during the marriage as the coverture fraction. *The choice of methods can sometimes make a substantial difference in such cases since contributions tend to get considerably larger as the employee gains seniority*.").

"A divorce case is equitable in nature, and a court of equity molds its relief according to the character of the case; once a court of equity acquires jurisdiction, it will do what is necessary to accord complete equity and to conclude the controversy." *Draggoo v Draggoo*, 223 Mich App 415, 428; 566 NW2d 642 (1997) (quotation marks and citations omitted). Here, after recognizing that neither party actually sought enforcement of the antenuptial agreement and that the court lacked the sort of forensic accounting that would have been necessary to unscramble the commingled marital and separate assets pursuant to the terms of the antenuptial agreement, the trial court instead made the commonsense decision to deem those assets marital property and divide them equally. By doing so, the trial court did what was necessary to effectuate an equitable property division and conclude the controversy; it did not commit error warranting reversal.

## 2. SPOUSAL SUPPORT PROVISIONS

Likewise, the trial court did not abuse its discretion by refusing to enforce ¶ 7c of the antenuptial agreement—"Neither of us shall seek alimony or spousal support from the other and all claims for future alimony/spousal support are waived"—due to a change of circumstances making enforcement unfair.[4] The trial court reasoned,

> The strongest argument for invalidation . . . is the change in facts and circumstances, making enforcement unfair and unreasonable. The test is whether the change of circumstances was foreseeable. Certainly [Cynthia] did not see that the marriage would result in her losing the majority of her pre-marital and separate assets while [Raymond] amassed a seven figure retirement portfolio. She also did not foresee that he would brutally assault her as they ate dinner one night.

Initially, we note that the trial court's analysis improperly focused on whether Cynthia actually, subjectively foresaw that the parties' separate estates might vary over the duration of the marriage. "[T]he first step in analyzing whether changed circumstances might justify refusing to enforce a prenuptial agreement is" to decide whether the changed circumstances were *reasonably* foreseeable when the agreement was made. *Reed*, 265 Mich App at 144. As such, the germane inquiry is whether, at the time the parties entered the antenuptial agreement, it was reasonably foreseeable that over time they might accumulate substantially different separate estates.

The financial schedules attached to the parties' antenuptial agreement indicate that Raymond entered the marriage with a separate estate of roughly $363,042, whereas Cynthia had a separate estate totaling roughly $187,992. Of Cynthia's $187,992 separate estate, $34,000 was the balance due on a note given to Cynthia by Raymond relative to their joint purchase of a home. But pursuant to the terms of the antenuptial agreement, that $34,000 debt was forgiven when the parties married. Thus, at the outset of marriage, Cynthia's separate estate would be $153,992, or a full $209,050 less than Raymond's separate estate. Various long-term investments comprised the vast majority of the parties' separate estates at that time.

---

[4] Given this conclusion, we need not address the alternative grounds for invalidity cited by the trial court.

Given the dichotomy between the amount of the parties' separate estates at the outset of the marriage and the fact that, under the terms of the antenuptial agreement, "any unearned income received during the marriage from separate property, including income from investments . . . or from passive or active property ownership" would remain separate property, it was reasonably foreseeable that the amount of the parties' separate estates might vary considerably over time. It is, of course, common knowledge—not to mention common sense—that different investments yield different rates of return over time. Moreover, it is axiomatic that, given the same rate of loss or return, a larger investment will yield a greater loss or return than will a smaller investment. Over time, it was almost inevitable that the parties' separate estates would increase or decrease at different rates and in different amounts, and it was therefore foreseeable that, following a decade and a half of marriage, those separate estates might have vastly different dollar values.

Nevertheless, we conclude that the trial court did not abuse its discretion by refusing to enforce ¶ 7c because the domestic abuse in this matter represented a change of circumstances that made enforcement unfair. At the outset, we note that, given Cynthia's testimony that such abuse occurred, and Raymond's conflicting testimony that it did not, the trial court's factual finding that the abuse occurred is a credibility determination that is owed deference. See *Butler v Simmons-Butler*, 308 Mich App 195, 200; 863 NW2d 677 (2014). And Raymond's related argument that the trial court clearly erred by finding that Raymond abused Cynthia—despite the fact that Raymond had previously been acquitted of domestic violence charges—is baseless. In a civil matter, evidence of acquittal "has little or no probative value" because of the differing burdens of proof in civil and criminal proceedings. *Cook v Auto Club Ins Ass'n*, 217 Mich App 414, 418; 552 NW2d 661 (1996) (quotation marks and citation omitted).

As explained in *Allard*, while unforeseeable domestic abuse that develops after marriage is not, by itself, "a sufficient change of circumstances to void an otherwise valid antenuptial agreement," such abuse *can* constitute a sufficient change for invalidation when the abuse "relate[s] to the issues addressed in the antenuptial agreement." *Allard*, 308 Mich App at 549-550. When the issue in question is spousal support, abuse can constitute a sufficient change of circumstances to make enforcement unfair if the abuse is both (1) unforeseeable and (2) directly affects the abused party's financial situation. *Id.* at 550.

Here, the trial court did not clearly err[5] by finding that the abuse was unforeseeable at the time the antenuptial agreement was executed. According to Cynthia's testimony, the abuse developed over several years *during* the marriage, beginning with verbal abuse and ultimately ending with outright physical violence. But there is no evidence of abuse *before* the parties

---

[5] In several places—interspersed haphazardly throughout the argument sections of his appellate briefs—Raymond argues that the trial court stated several other factual findings that are clearly erroneous. We do not reach that issue, however, because, by failing to include it in his statement of questions presented, Raymond has waived it. See *River Inv Group v Casab*, 289 Mich App 353, 360; 797 NW2d 1 (2010) ("This issue is waived because plaintiff failed to state it in the statement of questions presented in its brief on appeal."). Waiver "extinguish[es] any alleged error and foreclose[es] appellate review." *In re Tiemann*, 297 Mich App 250, 265; 823 NW2d 440 (2012).

married.  Thus, the trial court did not clearly err by finding that the abuse was unforeseeable at the time the parties entered the antenuptial agreement.

Moreover, if believed, Cynthia's trial testimony demonstrates that Raymond's abuse directly impacted her financial situation.  The abuse compelled Cynthia—by implicit threat of force—both to use her separate assets to pay marital debt and to assent to Raymond's use of marital assets for purposes Cynthia believed were improper.   Further, by holding that the domestic abuse represented a change of circumstances that made enforcement unfair, the trial court implicitly found that Cynthia's testimony was credible.[6]  Again, the trial court's implicit credibility determination is owed deference.  See *Butler*, 308 Mich App at 200.

Thus, the trial court did not abuse its discretion by refusing to enforce ¶ 7c of the antenuptial agreement.  Given the trial court's relevant factual findings, which were not clearly erroneous, the domestic abuse represented a change of circumstances that made enforcement of ¶ 7c unfair.[7]

## C.  ATTORNEY FEES

Finally, by way of her cross-appeal, Cynthia argues that the trial court abused its discretion by "summarily" denying her request for attorney fees.  "In civil actions tried without a jury, MCR 2.517(A)(1) requires the court to 'find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment.' "  *Douglas v Allstate Ins Co*, 492 Mich 241, 256; 821 NW2d 472 (2012).  "The court must articulate the reasons for its decision in order to facilitate appellate review."  *City of Detroit v Detroit Plaza Ltd Partnership*, 273 Mich App 260, 294; 730 NW2d 523 (2006) (quotation marks and citation omitted).  "Brief, definite, and pertinent findings and conclusions on the contested matters are sufficient," MCR 2.517(A)(2), and "[t]he court may state the findings and conclusions on the record or include them in a written opinion," MCR 2.517(A)(3).

Here, the trial court chose to announce its findings in a written opinion, but it provided no findings regarding the attorney fee issue, instead simply denying the parties' requests for fees without explanation.  The trial court's failure to announce adequate findings leaves us unable to afford this issue meaningful appellate review.

---

[6] The trial court is presumed to be aware of this Court's decision in *Allard*, and to properly apply the law as announced in that decision.  See *In re Costs and Attorney Fees*, 250 Mich App 89, 101; 645 NW2d 697 (2002).

[7] Although we need not reach the issue to decide this matter, we caution the trial court against relying on *Staple v Staple*, 241 Mich App 562; 616 NW2d 219 (2000), as it did in this case, as a ground for invalidating a waiver of the right to seek "alimony/spousal support" in an antenuptial agreement.  This Court's holding in *Staple* regards the waiver—in a divorce settlement agreement—of a party's right to petition for modification of an *extant* judgment for spousal support.  As such, the holding from *Staple* relied upon by the trial court is inapposite in cases, such as this, involving an *ante*nuptial (i.e., premarital) agreement that no spousal support judgment will ever be sought.

-12-

## IV. CONCLUSION

Accordingly, we affirm the trial court's rulings regarding the prenuptial agreement and remand this matter to the trial court for explanation regarding the attorney fee issue. Within 70 days of the date of this opinion, the trial court shall issue a written opinion containing brief, definite, and pertinent findings and conclusions regarding the attorney fee issue. On remand, the trial court may hold any proceedings it finds necessary to adequately address that issue, but it need not hold any proceedings if it finds that the existing record is sufficient.[8]

Affirmed in part and remanded to the trial court for further proceedings consistent with this opinion. We retain jurisdiction.

/s/ David H. Sawyer
/s/ Joel P. Hoekstra
/s/ Kurtis T. Wilder

---

[8] Because doing so may aid the trial court in timely complying with our remand instructions, we direct its attention to the following portion of *Myland v Myland*, 290 Mich App 691, 702; 804 NW2d 124 (2010):

> The applicable court rule, MCR 3.206(C)(2)(a), states:
>
> > A party who requests attorney fees and expenses must allege facts sufficient to show that
> >
> > (a) the party is unable to bear the expense of the action, and that the other party is able to pay. . . .
>
> This Court has interpreted this rule to *require* an award of attorney fees in a divorce action only as necessary to enable a party to prosecute or defend a suit. With respect to a party's ability to prosecute or defend a divorce action, a party may not be required to invade her assets to satisfy attorney fees when she is relying on the same assets for her support. Further, a party sufficiently demonstrates an inability to pay attorney fees when that party's yearly income is less than the amount owed in attorney fees. [Quotation marks and citations omitted; emphasis added.]

-13-

# Court of Appeals, State of Michigan

## ORDER

Cynthia Hobbs v Raymond Hobbs

Docket No. 325835

LC No. 13-000103 DO

David H. Sawyer
Presiding Judge

Joel P. Hoekstra

Kurtis T. Wilder
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence and be concluded no later than 70 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. The proceedings on remand are limited to the attorney fee issue addressed in the accompanying opinion.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court, copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ David H. Sawyer

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

February 14, 2017
_____
Date

Chief Clerk