LENTZ v LENTZ

Docket No. 257898. Submitted April 6, 2006, at Lansing. Decided July 6, 2006, at 9:00 a.m.

Dale F. Lentz and Judith Ann Lentz decided to separate after several years of marriage. They negotiated an agreement to divide their marital assets, then had an attorney draft a contract reflecting their wishes. The resulting separation agreement specified, among other things, that Dale Lentz would receive all the interest in his real estate and construction businesses, and that Judith Lentz would not be liable for the businesses' debts. Dale Lentz filed a complaint for separate maintenance in Washtenaw Circuit Court in which he requested that the trial court divide the parties' property pursuant to the separation agreement. The defendant filed a countercomplaint for separate maintenance, and asserted that the separation agreement should be set aside because she could not afford to hire a lawyer to review it, the plaintiff had coerced her into signing it, and the plaintiff had not given her a valuation of his businesses. After the parties stipulated to amend the filings from an action for separate maintenance to a divorce action, the trial court, Archie C. Brown, J., granted the parties a divorce judgment that incorporated the parties' separation agreement, ruling that the defendant did not establish that the agreement had been signed as the result of fraud, coercion, or duress. The defendant appealed.

The Court of Appeals *held*:

1. The trial court correctly ruled that the parties' separation agreement should be enforced because the agreement was unambiguous and the defendant did not establish the existence of fraud, coercion, or duress. The agreement had been negotiated over the course of six weeks, and the defendant had both the means and the opportunity to hire her own lawyer and to review the plaintiff's business records.

2. The standard of review traditionally applied to antenuptial agreements, which may be invalidated on a finding that their enforcement would be unfair or unreasonable, is not applicable to a postnuptial separation agreement in which the parties divide their marital assets.

Affirmed.

1. HUSBAND AND WIFE — SEPARATION AGREEMENTS — CONTRACTUAL INTERPRE-
   TATION.

   Contracts between consenting adults, including separation agree-
   ments between spouses, are enforced according to the terms to
   which the parties agreed in the absence of fraud, coercion, or
   duress, regardless of whether those terms are fair, equitable, or
   reasonable.

2. HUSBAND AND WIFE — POSTNUPTIAL AGREEMENTS — STANDARD OF REVIEW.

   The standard of review traditionally applied to antenuptial agree-
   ments, which may be invalidated on a finding that their enforce-
   ment would be unfair or unreasonable, is not applicable to a
   postnuptial separation agreement in which the parties divide their
   marital assets.

*Scott Bassett* for the plaintiff.

*J. Michael Southerland, P.C.* (by *J. Michael Souther-
land*), for the defendant.

Before: NEFF, P.J., and SAAD and BANDSTRA, JJ.

SAAD, J. In this divorce action, defendant, Judith
Lentz, contends that the trial court erred when it
ruled that the separation agreement she entered into
with plaintiff, Dale Lentz, is valid and enforceable.
According to defendant, the trial court should have
disregarded the separation agreement and awarded
her alimony and a share of plaintiff's business inter-
ests because plaintiff failed to adequately disclose his
business assets.

### I. FACTS AND PROCEDURAL HISTORY

Plaintiff and defendant were married on July 21,
1979, and, at the time of these proceedings, they had
two adult children. In December 2002, plaintiff discov-
ered that defendant was involved in the latest of a series
of affairs she had during the marriage. Accordingly, on

January 1, 2003, plaintiff and defendant decided to separate and began to negotiate a separation agreement to divide the marital assets. The parties chose not to file a divorce action at that time but, in the separation agreement, they provided that "[i]t is the intent of the parties that an action for separate maintenance will be filed in the future and that this agreement shall constitute all the terms of any judgment entered in said action."

Over a six-week period, plaintiff and defendant negotiated the terms of their separation and property settlement. Upon reaching an agreement regarding the division of their property, plaintiff and defendant asked their longtime friend and attorney, Larry Bowerman, to draft the separation agreement. According to Mr. Bowerman, before the separation, he had performed legal work for plaintiff's real estate development and construction businesses and he had also prepared wills for defendant's family and represented her father in a medical malpractice action.[1] Mr. Bowerman further testified that, after the separation, he continued to represent plaintiff in business matters and he represented defendant in a case involving the operation of a motor vehicle while under the influence of an intoxicating liquor.

Mr. Bowerman testified that, when he met with Mr. and Mrs. Lentz on February 7, 2001, plaintiff and defendant had already worked out the details of the separation agreement, and he merely drafted the document to reflect their wishes. Mr. Bowerman further testified that he did not represent either party in the process and that the separation appeared to him to be amicable. Mr. Bowerman said that he answered any questions posed by plaintiff and defendant and coun-

---

[1] The trial court found Mr. Bowerman to be a very credible witness.

seled them to have their own attorneys review the separation agreement. It is undisputed that neither party individually had an attorney review the contract.

Mr. Bowerman recalled that the parties discussed plaintiff's businesses and that Bowerman told defendant that he did not know anything about the financial status of the companies. However, according to Mr. Bowerman, defendant stated that she had previously talked to her divorce attorney, Brian Stacey, about the businesses. Defendant told Mr. Bowerman that Stacey informed her that litigation would require him to tie up or put a halt to plaintiff's businesses, which defendant did not want to do. According to Mr. Bowerman, defendant said that Mr. Stacey had informed her of her rights and that she did not want any interest in the businesses. At the meeting, plaintiff also talked about the outstanding debts for the businesses, which amounted to several million dollars. However, plaintiff stated that he did not want defendant to be liable for any of the debts. Accordingly, the separation agreement states that plaintiff shall receive all interest in the businesses, and the agreement contains a hold harmless clause that would protect defendant from personal liability for the businesses' debts.

Defendant testified that plaintiff represented to her that he owed several million dollars on the businesses. According to defendant, plaintiff told her that one of the real estate development projects in Belleville might eventually make money, but that the condominiums would first have to be sold. However, defendant also recalled that plaintiff said he would walk away from the businesses if she demanded half of them. Defendant further testified that she asked her friend, Janice Palis, who was also the controller of one of plaintiff's businesses, Antler Construction, Inc., whether plaintiff's businesses were actually millions of dollars in debt and that Ms. Palis confirmed that plaintiff's representation

was accurate. Defendant stated that Ms. Palis invited her to come in and review all the financial records for the businesses, but she decided not to do so. Defendant also testified at trial that, before she signed the separation agreement, plaintiff said she could review the business records.

Defendant acknowledged that, primarily to avoid going to court, she and plaintiff negotiated the separation agreement and agreed to ask Mr. Bowerman to draft it. According to defendant, she kept their home in Florida and plaintiff agreed to pay her $1 million. Until plaintiff could satisfy this obligation, they agreed that he would continue to pay her status quo maintenance and he agreed to continue paying for her health insurance for ten years. With regard to alimony, the separation agreement further provides:

> Both parties agree that the provisions herein are in lieu of or in satisfaction of any claim by either party for alimony or spousal support. Each party forever waives any claim against the other for alimony or spousal support.

On February 14, 2003, plaintiff filed a complaint for separate maintenance and asked the trial court to divide the property pursuant to the parties' separation agreement. On March 19, 2003, defendant filed a countercomplaint for separate maintenance, but did not request enforcement of the separation agreement. Thereafter, plaintiff filed a motion to limit discovery and for summary disposition. According to plaintiff, the broad discovery requested by defendant was irrelevant because the separation agreement defined how the property should be divided. In response, defendant argued that the separation agreement should be set aside because plaintiff coerced her into signing the agreement, she could not afford to hire a lawyer to review it, and plaintiff failed to give her a valuation of his businesses. Defendant further argued that plaintiff

breached the separation agreement by failing to pay her $50,000 of the $1 million and by failing to pay her bills after July 2002, in violation of the status quo provision. The trial court denied plaintiff's motion for summary disposition on July 17, 2003, and ruled that there was an issue of fact for trial.

A bench trial commenced on February 17, 2004, before Judge Archie C. Brown. After the parties stipulated to amend their filings from an action for separate maintenance to a divorce action, Judge Brown granted the parties a divorce and, from the bench, ruled that the separation agreement was valid, equitable, and enforceable and that defendant failed to show that she entered into the agreement because of fraud, coercion, or duress.[2] However, Judge Brown also ruled that the parties should submit additional evidence regarding whether plaintiff complied with the status quo provision by continuing to pay defendant's bills until he satisfied his obligations under the separation agreement. Judge Brown signed the judgment of divorce on August 26, 2004. The judgment provided that the property would be distributed as the parties agreed in the separation agreement and that plaintiff must pay defendant an additional $84,277 to satisfy the remaining balance due under the status quo provision.

## II. ANALYSIS

### A. SUMMARY OF HOLDING

Defendant seeks to avoid the separation agreement she made with plaintiff to divide their marital property. To preclude enforcement of the contract, she asked the

---

[2] Judge Brown's comprehensive and detailed findings of fact and conclusions of law are found at pages 108 through 137 of the February 20, 2004, trial transcript.

trial court to either (1) find that plaintiff coerced her into making this agreement or (2) void the contract because plaintiff allegedly failed to provide defendant with sufficient financial data to make an informed agreement. The trial court ruled that defendant was not coerced into making this contract and, though defendant has abandoned the issue on appeal, we agree that ample evidence shows that no duress or coercion took place.

Defendant's central claim on appeal is that the trial court erred when it enforced the terms of the separation agreement because, according to defendant, plaintiff failed to adequately disclose financial information about his businesses. Generally, contracts between consenting adults are enforced according to the terms to which the parties themselves agreed. *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). But some contracts, such as antenuptial agreements, are not simply enforced as written because our courts historically sought to protect what the courts regarded as the "weaker" party to these agreements. Thus, antenuptial agreements, though otherwise valid, could be invalidated on the basis of the nondisclosure of a material fact, or if "circumstances changed since the agreement was executed, so as to make its enforcement unfair and unreasonable[.]" *Rinvelt v Rinvelt*, 190 Mich App 372, 380; 475 NW2d 478 (1991), quoting *Brooks v Brooks*, 733 P2d 1044, 1049 (Alas, 1987).

Defendant asks this Court to review separation agreements using the same legal principles that, according to defendant, courts have traditionally applied to antenuptial agreements.[3] We find no reason to rewrite a

---

[3] However, our courts are clearly less inclined to rewrite antenuptial agreements on the basis of a purported "fairness" inquiry. As our Court recently clarified in *Reed v Reed*, 265 Mich App 131, 144-145; 693 NW2d 825 (2005):

contract between adults who negotiated their own property disposition in anticipation of separation or divorce. Absent fraud, coercion, or duress, the adults in the marriage have the right and the freedom to decide what is a fair and appropriate division of the marital assets, and our courts should not rewrite such agreements.

### B. LEGAL ANALYSIS

It is undisputed that the separation agreement unequivocally provides that plaintiff would keep any interest he had in his businesses, that the parties intended the separation agreement to define the property rights of the parties, and that they intended the agreement to be binding. As our Supreme Court explained in *Rory, supra* at 468:

> A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*. Courts enforce contracts according to their unambiguous terms because doing so *respects the freedom of individuals freely to arrange their affairs via contract*. This Court has previously noted that " '[t]he general rule [of contracts] is that *competent persons shall have the utmost liberty of contracting and*

---

"Antenuptial agreements are subject to the rules of construction applicable to contracts in general. Antenuptial agreements, like other written contracts, are matters of agreement by the parties, and the function of the court is to determine what the agreement is and enforce it. Clear and unambiguous language may be [sic] not rewritten under the guise of interpretation; rather, contract terms must be strictly enforced as written, and unambiguous terms must be construed according to their plain and ordinary meaning. If the agreement fairly admits of but one interpretation, even if inartfully worded or clumsily arranged, it is not unambiguous [sic]. [Citations omitted.]" [*Id.* at 144-145, quoting *Kuziemko v Kuziemko*, unpublished opinion per curiam of the Court of Appeals, issued December 4, 2001 (Docket No. 212377), slip op at 4.]

> *that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.* ' " [Citations omitted; some emphasis added.]

On the basis of these well-established rules, because the parties' voluntarily negotiated agreement is unambiguous, the trial court correctly ruled that its terms should be enforced as written.

Nonetheless, defendant claimed in the trial court that, when she signed the postnuptial agreement, she did not have a full accounting of the financial status of plaintiff's businesses and that her waiver of an interest in them was, therefore, invalid. She now argues that, as a matter of law, the trial court was required to determine whether plaintiff fully revealed his business assets at the time the parties entered into the agreement and whether the agreement was fair and equitable. In so arguing, defendant urges this Court to adopt a rule that she claims applies to antenuptial agreements: that to enforce the antenuptial agreement, a spouse must give a full accounting of all marital assets. See *Shinkle v Shinkle*, 255 Mich App 221, 228; 663 NW2d 481 (2003).[4]

Michigan has long recognized the validity of property agreements entered into at the time of separation. *Randall v Randall*, 37 Mich 563 (1877); *In re Berner's Estate*, 217 Mich 612; 187 NW 377 (1922). We note, for clarification, that separation agreements, though postnuptial, differ from those postnuptial agreements in which parties intend to remain married but wish to clarify or waive their rights of inheritance in a spouse's estate. See *In re Highgate Estate*, 133 Mich App 32, 36; 348 NW2d 31 (1984). We also take this opportunity to clarify

---

[4] Contrary to defendant's position, in *Reed, supra* at 148-149, this Court called into doubt whether a full accounting of marital financial information is required to have a valid antenuptial agreement.

the standard of review for postnuptial separation agreements because recent cases set forth an imprecise and, we believe, inaccurate statement of the law.[5] This Court discussed the appropriate standard for reviewing property agreements upon separation of the parties in *Keyser v Keyser*, 182 Mich App 268, 269-270; 451 NW2d 587 (1990), in which this Court opined:

> It is a well-settled principle of law that courts are bound by property settlements reached through negotiations and agreement by parties to a divorce action, in the absence of fraud, duress, mutual mistake, or severe stress which prevented a party from understanding in a reasonable manner the nature and effect of the act in which she was engaged. *Calo v Calo*, 143 Mich App 749, 753-754; 373 NW2d 207 (1985). This rule applies whether the settlement is in writing and signed by the parties or their representatives or the settlement is orally placed on the record and consented to by the parties, even though not yet formally entered as part of the divorce judgment by the lower court. *Howard v Howard*, 134 Mich App 391, 394-395; 352 NW2d 280 (1984). The finding of the trial court concerning the

---

[5] For example, in light of the obvious differences between separation agreements and postnuptial agreements that merely define rights of inheritance, we disagree with the standard of review for separation agreements set forth in *Corning v Corning*, unpublished opinion per curiam of the Court of Appeals, issued January 3, 2003 (Docket No. 229683). The *Corning* panel stated that "[a] postnuptial agreement is valid if it is fair, equitable, and supported by sufficient legal consideration." The *Corning* panel cited for this rule *Rockwell v Estate of Rockwell*, 24 Mich App 593, 596; 180 NW2d 498 (1970), but *Rockwell* addressed an agreement entered into during marriage by spouses who intended to remain married but wished to define their rights to property when one of the spouses died. We also note that, despite a stated intent to adhere only to traditional contract principles, in another unpublished opinion, *Chwalik v Chwalik*, unpublished opinion per curiam of the Court of Appeals, issued December 15, 2005 (Docket No. 250360), this Court nonetheless considered whether the amount of spousal support to which the parties agreed in the contract was unreasonable. We believe such an inquiry impermissibly goes beyond accepted rules of contract construction.

validity of the parties' consent to a settlement agreement will not be overturned absent a finding of an abuse of discretion.

In *Keyser*, the defendant wife carried on an extramarital affair during her marriage to the plaintiff, and the parties separated after 15 years of marriage. *Keyser, supra* at 270. The plaintiff's attorney drafted a property agreement to reflect the defendant's stated desire to keep only a pickup truck and her personal belongings. *Id.* The defendant signed the agreement and a witness testified that the defendant indicated that she "was neither coerced nor forced nor under duress when she signed it." *Id.* at 271. The defendant later moved to set aside the agreement and argued that the plaintiff said she "had to" sign the document. *Id.* The trial court denied the defendant's request to vitiate the contract and, on appellate review, this Court quoted with approval the trial court's reasoning:

> "The question before this Court is not whether the property settlement is 'equitable' but whether the defendant freely, voluntarily and understandingly entered into and signed the agreement. This Court is of the opinion that the property settlement is the product of the voluntary act of the defendant and ought to be enforced. The testimony of the legal secretary is totally contrary to the testimony of Mrs. Keyser and dispels the claim of coercion or fraud.
>
> "As a fact finder, I find that Mr. Keyser is far more credible than Mrs. Keyser, I find her story concerning the signing of the document at her home incredulous [sic]. The defendant has failed to establish fraud, duress or mutual mistake of fact. *Tinkle v Tinkle*, 106 Mich App 423; 308 NW2d 241 (1981).
>
> "The motion to set aside the property settlement is therefore considered and denied. The Court is not impressed with the division of the property in this case, however, *it is not the function of this Court to interfere with the rights of the parties to bargain away their marital estate.*

> The underlying purpose is to encourage litigants to settle their differences and to obviate the necessity of a contested hearing." [*Keyser, supra* at 271-272 (emphasis added).]

This Court affirmed the trial court's denial of the defendant's motion to set aside the property agreement and explained:

> After a thorough review of the record, we find that the trial court did not err in its findings. There was testimony that defendant had read the property agreement and was clearly aware of the parties' marital assets and debts. Under these circumstances, we find that the terms of the property agreement were consistent with defendant's request. We find no evidence of fraud, duress or mutual mistake or that defendant was under severe stress when she signed the property settlement agreement. [*Id*. at 272.]

Here, we also affirm the trial court's findings that defendant failed to establish fraud, duress, or mistake. Though defendant asserted in the trial court that she felt pressure to enter into the separation agreement because she was afraid she would not receive any of the marital property, the trial court correctly found that overwhelming evidence established that defendant did not enter into the agreement under duress. To the contrary, evidence showed that the parties negotiated the property division over a period of six weeks and that defendant had ample opportunity to review the business records, that she had the means to seek the advice of an attorney and she did so, that all her questions were answered by Mr. Bowerman, and that the parties discussed and negotiated the marital assets and the potential for spousal support.

Moreover, to the extent defendant's argument about plaintiff's disclosure states an allegation of fraud, the record reflects that, during his marriage to defendant, plaintiff had worked in the real estate development

business for several years. Thus, the trial court correctly observed that defendant was aware of the risks and unpredictability of profits involved in the business. Evidence further established that defendant knew about properties owned by the businesses, that she knew certain developments were underway, and that she knew there was a potential for profit in plaintiff's condominium development. When they entered into the separation agreement, plaintiff disclosed to defendant that his businesses carried significant debt, and this was supported by evidence at trial. He and his controller also told defendant that she could review all the business records before she decided whether to claim any interest in the businesses. Clearly, plaintiff was not required to compel defendant to review the business records or to make specific projections regarding potential profits. The record further shows that defendant consulted an attorney with regard to her rights in the businesses. Notwithstanding that detailed information was fully available to her, defendant declined to review the records, she chose not to take any interest in the businesses, and she declined to have her attorney review the separation agreement.[6]

We hold that the standard of review traditionally applied to antenuptial agreements is not applicable to a postnuptial separation agreement wherein the parties divide their marital assets. Public policy favors uphold-

---

[6] We also conclude that there is substantial evidence to support the trial court's factual finding that defendant knowingly allowed plaintiff to retain the interest in his businesses either because she wanted to move on with her life in Florida or because she did not want to be personally responsible for any of the business debt. In so holding, we explicitly reject defendant's claim that the invitation to review the business records constituted a mere "half-truth" or that plaintiff's testimony regarding how many millions of dollars of debt the businesses carried had any impact on the validity of the separation agreement.

ing a property agreement negotiated by the parties when divorce or separate maintenance is clearly imminent. Such agreements undoubtedly promote judicial efficiency and best effectuate the intent and needs of the parties. Further, we will not rewrite or abrogate an unambiguous agreement negotiated and signed by consenting adults by imposing a "reasonable" or "equitable" inquiry on the enforceability of such agreements. An application of general contract principles to this agreement mandates only one conclusion: the parties freely entered into an agreement to divide their property as they saw fit, and we will not redraft the agreement or rule in a manner that allows either party to avoid his or her contractual obligations.

In sum, the record fully supports the trial court's holding that defendant failed to establish fraud, duress, or mistake and, as the trial court correctly concluded, the parties entered into a valid, enforceable contract that must be affirmed under general contract principles.[7]

---

[7] We also reject defendant's claim that the trial court should have ruled that her waiver of alimony is invalid as a matter of law. Defendant has abandoned this issue because she has failed to adequately brief it. "An appellant may not merely announce its position or assert an error and leave it to this Court to discover and rationalize the basis for its claims, unravel or elaborate its argument, or search for authority for its position." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 499; 668 NW2d 402 (2003). The statutory section cited in defendant's brief, MCL 552.23, *permits* a trial court to award spousal support, but makes no reference to any such *requirement* under these facts. Further, defendant cites no facts and makes no argument to establish that the assets she voluntarily retained through the settlement agreement were inequitable and insufficient for suitable support. Moreover, given defendant's lack of legal analysis with regard to whether a party may relinquish the right to spousal support, we decline to nullify the parties' unambiguous agreement to "forever waive[] any claim against the other for alimony or spousal support." We also note that the value of the property that the parties agreed should go to defendant is roughly $2 million.

Affirmed.

NEFF, P.J. I concur in the result only.