*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CARLA ELLEN SKAATES,

Plaintiff-Appellee,

v

NATHAN KAYSER,

Defendant-Appellant.

FOR PUBLICATION
July 16, 2020
9:00 a.m.

No. 346487
Marquette Circuit Court
Family Division
LC No. 16-055134-DO

Before: MURRAY, C.J., and METER and K. F. KELLY, JJ.

MURRAY, C.J.

Defendant appeals by right a judgment of divorce and an order determining that a postnuptial agreement was enforceable. We affirm.

## I. BACKGROUND[1]

The parties met and began cohabitating in 2003. Plaintiff is a dentist who operates her own practice, while defendant has engaged in a number of business ventures and occupied various positions over his life. Beginning in 2006, after plaintiff purchased her own dental practice, defendant began working as the practice's business manager.[2]

In 2011, plaintiff and defendant began discussing marriage. The parties had lived together for years, but each had their own separate businesses and assets. Thus, leading up to their 2012 marriage, the parties negotiated the terms of what was to be a prenuptial agreement. Plaintiff and

---

[1] These facts are taken from the evidentiary hearing held on the validity of the postnuptial agreement.

[2] The parties disputed defendant's role in this position as well as his role in acquiring the practice. However, there was no dispute that plaintiff utilized an outside company that specialized in the sale and purchase of dental practices or that plaintiff financed the acquisition entirely with her own funds.

-1-

defendant e-mailed back and forth, and discussed an agreement for approximately 16 months before its execution.

Although the agreement was supposed to be a prenuptial agreement, it turned into a postnuptial agreement because of time constraints. In other words, despite working on it for 16 months and agreeing to the major provisions, the agreement was not signed prior to the marriage. Plaintiff testified that, after they were married, defendant indicated that he was not going to sign the agreement, which greatly frustrated her. Nonetheless, after reviewing the document and obtaining advice from separate legal counsel, the agreement was eventually executed on September 19, 2012, which was approximately one month after the marriage.

At the outset the parties set forth the purpose of the agreement:

> The parties want to define and clarify their respective rights in each other's property and in any jointly owned property they now own or might accumulate after today and to avoid interests that, except as provided by this agreement, they might otherwise acquire in each other's property as a consequence of their marriage relationship.

The parties agreed that plaintiff's preexisting dental practice would remain plaintiff's individual property and, if divorce occurred, that she would be awarded the asset completely. On the other hand, if plaintiff died before defendant, then he was permitted to sell the practice and retain the proceeds. Before the marriage plaintiff created a limited liability company (LLC) that owned the building in which the dental practice operated. Through the agreement, plaintiff transferred to defendant a 25% ownership interest in this company, and the building was designated a marital asset. If divorce occurred, the property would be divided according to the parties' ownership interest, with plaintiff having the option to buy out defendant's interest. As with the dental practice, if either party died before the other, the survivor would have 100% ownership. For his part, defendant owned before the marriage "3D Heli-Hub, LLC,"[3] which under the agreement would continue to be defendant's individual property; if divorce occurred, he would solely be awarded the company. If defendant died before plaintiff, then she could sell the company and retain the proceeds.

The parties had equal ownership of "Lady Lab-Coats, LLC,"[4] and the parties agreed that, if divorce occurred, the company would be divided equally, with plaintiff having the option to buy out defendant's interest. Again, if one party died before the other, then the survivor would have 100% ownership. The agreement also provided that plaintiff would transfer to defendant a 50% interest in the marital home, and if divorce occurred the parties would divide the property based on their ownership interests at the time of the divorce, with plaintiff having the option to buy out

---

[3] 3D Heli-Hub, LLC was a hobby store that defendant had opened and operated for a number of years.

[4] Lady Lab Coats, LLC was a corporation created to pursue plaintiff's idea about making a more "feminine version" of the traditional "white lab coat," but the venture "never really went too far."

defendant's interest. As with other property, if one party died before the other, then the survivor would receive 100% ownership.

As to each of their respective bank, investment, and retirement accounts, as well as life insurance policies, annuities, and other similar assets, the parties agreed that they would remain separate property and would not be subject to division if divorce occurred. Similarly, the parties agreed that any inheritances would be separate property, and that defendant would remain a beneficiary of two of plaintiff's life insurance policies so long as the parties remained married, with defendant remaining a beneficiary "at a level equal to or greater than forty percent" as long as the policies were in effect.

Additionally, the agreement provided that the parties would dissolve their tenancy in common for the camp property and, in its place, would create a tenancy by the entireties between them. Each party would have equal ownership, and it would be marital property. If divorce occurred, defendant would have the option to buy out plaintiff's interest.[5] All other property not mentioned in the agreement was to remain separate property with neither party having a claim to the other's property.

Importantly, the parties agreed on a "cooling off" provision, a procedure to be used when contemplating divorce. Specifically, if one party desired to file for divorce, the parties agreed to wait four months before doing so. In this way, the parties had a "cooling off" period to work out marital issues. Consistent with that goal, the parties also agreed to attend a minimum of three joint marital counseling sessions during this period.

In October 2016, plaintiff filed for divorce without waiting four months and before attending any counseling sessions. Plaintiff subsequently filed a motion to enforce the agreement. Defendant opposed the motion, and asked the court to void the agreement, arguing: (1) the agreement went against public policy because it was made in contemplation of a future divorce and left plaintiff in a more attractive financial position in the event of that divorce; (2) he signed the agreement under duress, which resulted from uneven bargaining power, financial pressures, and a threat of divorce; (3) plaintiff materially breached the agreement by failing to follow the cooling off provision, which prevented her from now seeking to enforce the agreement; and (4) plaintiff failed to fully disclose her assets, specifically certain gold coins that plaintiff had possessed and sold. The trial court conducted an evidentiary hearing on the issue of enforceability, where the parties' presented their own testimony and offered exhibits into evidence.

The trial court issued a written decision granting plaintiff's motion. In its opinion, the trial court noted that the parties had discussed the terms of the agreement for a period of 16 months, and that each party had been represented by counsel throughout this period, and up to the

---

[5] The agreement also addressed day-to-day financial issues. For example, the parties agreed to create a joint marital checking account by January 2014, which would be "used for all routine household expenses." The parties agreed to contribute "an amount as mutually agreed each year," by using their respective financial status to determine their respective contributions. According to the agreement, the parties intended "to share household expenses that are derived for their mutual benefit."

agreement's execution. The trial court stated that, although the parties "contemplated" that the agreement would be a prenuptial agreement, it "evolved into a postnuptial agreement" because the parties married six weeks before the agreement was executed.

Recognizing that postnuptial agreements were not unenforceable per se and were acceptable if they "intended to promote harmonious marital relations and keep the marriage together," the trial court found that the agreement was the type of postnuptial agreement acceptable under Michigan law, reasoning in part that

> [n]othing in the agreement itself or the record suggests that the parties contemplated a separation in the near future when they signed the agreement. On the contrary, the agreement was made in large part to fulfill the desire of the parties to define and clarify their respective rights in each other's property and in any jointly held property that they owned prior to the execution of the Marital Agreement or thereafter acquired.

The trial court further concluded that the agreement did not leave one of the parties in a far more favorable position were they to abandon the marriage, but that overall the agreement favored defendant in light of the short duration of the marriage. In sum, the trial court found that the agreement was "relatively balanced and does not incentivize divorce."

With respect to defendant's duress argument, the trial court found that the parties had discussed the agreement for 16 months, that the last-minute e-mail on the wedding day included changes that the parties had previously been discussing, that defendant conceded that he had understood and voluntarily signed the agreement, and that the parties had each consulted independent counsel before signing the agreement. As a result, the trial court found that defendant was not under duress that would void the agreement.

Additionally, the trial court rejected defendant's material breach argument, finding that, although plaintiff had "technically violate[d] this provision," the agreement did not provide any remedy for a breach, and that plaintiff cured any breach because "after the breach was pointed out to [her] and she took no further steps to proceed with the divorce proceeding and engaged in 5 or 6 marriage counseling sessions."[6]

Defendant filed a motion for reconsideration, which the trial court denied, and after another hearing, entered a judgment of divorce that was consistent with the agreement.

Before this Court, defendant challenges both the trial court's decision on the enforceability of the agreement, and the judgment of divorce as it relates to the invasion of separate assets and attorney fees.

## II. ANALYSIS

---

[6] The trial court did not reference defendant's arguments on the alleged nondisclosure of the gold coins.

## A. THE AGREEMENT'S ENFORCEABILITY

### 1. STANDARDS OF REVIEW

Since postnuptial and other marital agreements are contracts, we are guided by contract principles in reviewing the agreement. See *Hodge v Parks*, 303 Mich App 552, 558; 844 NW2d 189 (2014); *Lentz v Lentz*, 271 Mich App 465, 471-472 & n 3; 721 NW2d 861 (2006). Accordingly, we review de novo the trial court's interpretation of a contract as well as its ruling on legal questions that affect the contract's validity. *Hodge*, 303 Mich App at 558. However, we review for clear error any factual findings made by the trial court. *Id*.

### 2. PUBLIC POLICY

Defendant argues that the agreement was unenforceable because it was contrary to public policy. As defendant notes, the general rule is that "a couple that is maintaining a marital relationship may not enter into an enforceable contract that anticipates and encourages a future separation or divorce." *Id*. (quotation marks and citation omitted). To allow such agreements "would encourage separation or divorce, which is not an appropriate public policy." *Id*., citing *Randall v Randall*, 37 Mich 563, 571 (1877). One way a postnuptial agreement encourages separation or divorce is if the terms are "calculated to leave [one party] in a much more favorable position to abandon the marriage." *Hodge*, 303 Mich App at 558 (quotation marks and citation omitted; alteration in original).

Despite this general prohibition against postnuptial agreements, we have recognized that they " 'are not invalid *per se,*' because some postnuptial agreements may be intended to promote harmonious marital relations and keep the marriage together." *Id*. at 558-559 (citation omitted). Such agreements do not implicate the public-policy concerns of *Randall*. *Id*. at 559. Accordingly, if the agreement in question "seeks to promote marriage by keeping a husband and wife together, Michigan courts may enforce the agreement if it is equitable to do so." *Id*.

According to defendant, there are essentially three types of postnuptial agreements that have been upheld by Michigan courts: where the parties are separated or a divorce action is pending and the parties either seek to (1) reconcile their marriage or (2) agree to settlement terms to be entered into a divorce judgment in the near future, or (3) where the married couple is not separated, but they enter into an agreement to determine property rights upon the death of one of the spouses. What are not typically upheld in Michigan courts, according to defendant, is a postnuptial agreement entered into by a married couple that is not separated and which establishes each respective spouse's rights in the event of divorce. This latter prohibition, according to defendant, exists because of the longstanding Michigan public policy against enforcing postnuptial agreements that promote divorce.

For the most part we have no disagreement with the general legal propositions argued by defendant. After all, a reconciliation-type agreement was upheld in *Hodge*, 303 Mich App at 560, while in *Lentz*, 271 Mich App at 467, we upheld a separation-type agreement between spouses who were no longer living together. And, postnuptial agreements between married parties that address inheritance issues upon a spouse's death have been upheld. *Rockwell v Rockwell's Estate*, 24 Mich App 593, 597-598; 180 NW2d 498 (1970); *In re Highgate Estate*, 133 Mich App 32, 36;

348 NW2d 31 (1984). But we do disagree with the proposition that *all* postnuptial agreements made by happily married couples living together (i.e., not separated or otherwise contemplating divorce) that address property rights in the event of divorce are invalid as a matter of law. Indeed, in *Ransford v Yens*, 374 Mich 110; 132 NW2d 150 (1965), an equally divided Supreme Court upheld a provision similar to that entered into by the parties here. In *Ransford*, the parties entered into an agreement three years after their marriage that set forth their respective rights to property. *Id*. at 110-111. As in this case, in *Ransford* the parties had separately accumulated property prior to the marriage. *Id*. at 111. The written agreement not only determined their respective rights to existing property, but it also indicated that if the parties subsequently discontinued living together as husband and wife, each party would be responsible to support themselves, and neither would be entitled to any interest in the other spouse's property. *Id*. at 112. After entering into the agreement, the couple continued to live together as husband and wife, but separated eight months before the husband's death. *Id*. at 112-113.

In the ensuing estate matter in probate court, the wife sought a widow's allowance from her husband's estate, a request that was opposed by the estate administrator on the basis of the postnuptial agreement. *Id*. at 113. The probate court held that the wife was entitled to the widow's allowance because "the agreement, having been made when the parties were not separated and not contemplating separation, was void as against public policy." *Id*. On appeal, the circuit court reversed, holding that the overall context of the agreement's language revealed that it was not made in contemplation of, or in furtherance of, a divorce, but was in part to resolve an existing dispute and in part to resolve any potential future property disputes. *Id*. at 113-114.

On appeal to the Supreme Court, the wife argued that the agreement was void under *Day v Chamberlain*, 223 Mich 278; 193 NW 824 (1923). *Ransford*, 374 Mich at 114. Four justices of the Court concluded otherwise, holding that the language of the agreement showed that it was in furtherance of the marriage relation because it set forth their respective rights and obligations which was important to the parties and their marital harmony:

> The parties to the instant agreement expressly stated they were agreeing to 'continue to live together as husband and wife,' and there is nothing in the agreement that shows it was 'calculated to favor a separation,' or that it was drawn to 'provide for a separation of the parties and a breaking up of the marriage.' Instead of coming to such a conclusion, it is more logical to state that the parties now before this Court entered into said agreement with the hopes that the marital journey they had commenced as rather elderly people would continue on without discord if they eliminated the only dispute or problem they faced, namely: The eventual disposition of property owned severally at the time of marriage as well as that acquired jointly during the marriage. [*Id*. at 116.]

We agree with the opinion written by Justice KELLY in *Ransford*, and find that it is the most applicable case to resolving the validity of the parties' agreement.[7] And, it is an example of a

---

[7] Eight justices sat on the *Ransford* Court, and an evenly decided decision is not precedent. *Sculthorp v American Motors Corp*, 7 Mich App 410, 412; 151 NW2d 905 (1967). But that decision nevertheless contains persuasive reasoning.

postnuptial agreement upheld by the Supreme Court when it was entered into by a married couple living together while setting forth their respective rights and obligations as to existing property and future obligations should a divorce or separation occur. See, also, *Rockwell*, 24 Mich App at 598-599 (recognizing that the *Ransford* Court affirmed the trial court's enforcement of the postnuptial agreement made while the parties were married and which contained some provisions addressing the possibility of divorce).

Turning back to the parties' agreement, the parties initially acknowledge their mutual desire "to *define and clarify their respective rights* in each other's property and in any jointly owned property they now own or might accumulate after today and to avoid interests that, except as provided by this agreement, they might otherwise acquire in each other's property as a consequence of their marriage relationship" (emphasis added). This description is important in understanding its purpose and the parties' intent, as the plain language demonstrates that its purpose was merely to define and clarify the parties' rights during the course of the marriage and at the end of the marriage, whether it ends by divorce or death. Nothing in the agreement suggests that it was created in contemplation of a future separation or divorce. In fact, the agreement contained terms to help support the marriage. For example, one provision speaks to the creation of a joint marital checking account, the purpose of which is to fund joint expenses *during* the marriage. In this way, the parties could easily pay for joint expenses while still retaining their separate bank accounts, thereby eliminating a potential acrimonious issue and promoting a harmonious marriage.

To this same point, the agreement also contained a "cooling off" provision, which required the parties to wait four months and attend joint marital counseling before filing for divorce. This provision likewise reflects the parties desire to refrain from making hasty decisions and to take affirmative steps to preserve the marriage if possible. We therefore reject defendant's contention that the agreement was created to encourage, or was made in contemplation of, divorce, rather than for the harmonious continuation of the marriage.

Postnuptial agreements that make it more financially attractive for a party to divorce are viewed as encouraging divorce, and have been invalidated on that basis. See *Hodge*, 303 Mich App at 558-559; *Rockwell*, 24 Mich App at 597-599. But we reject defendant's contention that this agreement's division made it more attractive for plaintiff to divorce him. In fact, as the trial court recognized, the evidence is the opposite. Under the agreement, plaintiff transferred a portion of several significant premarital interests to defendant, including a 25% ownership interest in her dental practice building; a 50% interest in the marital home (which plaintiff had purchased prior to the marriage with her own funds); and an immediate 50% interest in the camp property, which plaintiff had, again, purchased entirely with her own funds. Moreover, defendant's various bank, investment, and retirement accounts, as well as his financial items, remained separate property and under his complete control. The trial court found that the division was equitable, especially in light of the marriage's short duration, and, in light of the evidence presented, this determination was not clearly erroneous.

We also think it important that the parties discussed and negotiated the agreement for 16 months, most of which was prior to the marriage. It was undisputed before the trial court that the agreement was supposed to be a prenuptial agreement, and that it became a postnuptial one only

because time constraints prevented earlier finalization.[8] Accordingly, we agree with the trial court that this was not an agreement that contemplated a future divorce; nor was it an agreement that encouraged divorce. Instead, the agreement reveals that the parties clearly wished to be married and remain married, and the agreement was meant to help facilitate this.

The language of the agreement, coupled with the trial court's findings, is what takes this case out of the *Randall* line of cases. In *Randall* and subsequent decisions, the Court ruled that agreements "*calculated to favor* a separation which has not yet taken place will not be supported" by the common law. *Randall*, 37 Mich at 571 (emphasis added).[9] Here, the trial court did not clearly err in its findings that the agreement was not "calculated to favor" separation or divorce, but was meant to do just the opposite, taking this case outside the holding of *Randall*. Likewise, the *Day* Court struck down an agreement because the "husband and wife were living and cohabitating together at the time [of signing the separation agreement] and continued so to do for nearly two months thereafter." *Day*, 223 Mich at 281. And, unlike in *Wright v Wright*, 279 Mich App 291, 297; 761 NW2d 443 (2008), where we affirmed the trial court's finding that the terms of a postnuptial agreement significantly favored one spouse over the other (thus encouraging separation), here the trial court's findings supported the opposite conclusion.

Based on the trial court's findings, though living together, the parties' agreement was not in contemplation of them separating or divorcing. As the trial court concluded, because the postnuptial agreement addressed the disposition of property at death or in case of divorce, and otherwise allowed the parties to pursue their marriage in a manner most likely to allow it to flourish, and was not otherwise inequitable in its terms, it was not contrary to public policy.

### 3. DURESS

Defendant next contends that the trial court erred by determining that he did not sign the agreement under duress.

"A contract may be deemed unenforceable if it was executed under duress." *Allard v Allard*, 308 Mich App 536, 551; 867 NW2d 866 (2014), rev'd in part on other grounds 499 Mich 932 (2016). To successfully demonstrate duress, a party must show "that they were illegally compelled or coerced to act by fear of serious injury to their persons, reputations, or fortunes." *Id*. (quotation marks and citations omitted). "[F]inancial ruin alone" does not demonstrate "economic duress; it must also be established that the person applying the coercion acted unlawfully." *Id*. (quotation marks and citation omitted).

Defendant advanced no allegations or evidence that he was *illegally* compelled or coerced to enter the agreement by fear of serious injury to his person, reputation, or fortune. To support his duress argument, defendant testified that, on the day of the marriage, he was stressed, distracted, and felt "ambushed" because the latest draft of the agreement was sent to him that day.

---

[8] Evidence showed that defendant in fact requested that the agreement get wrapped up after the marriage, as it would reduce any associated stress with completing it by that deadline.

[9] It is worth pointing out that the Legislature has not spoken on the policy of postnuptial agreements, and so this issue remains one of common law for the courts.

This set of circumstances is much less severe than those in *Allard*, where the defendant was first presented with the antenuptial agreement 10 days before the wedding, and signed the agreement on the day of the wedding under pressure that the wedding would be called off and large sums of money would be lost from canceling the wedding. *Allard*, 308 Mich App at 553. Additionally, the defendant did not consult with separate counsel. *Id*. at 540. Here, the agreement was not executed on the same day as the marriage; it was executed *after* the marriage and after the distractions and stresses had passed. Additionally, as the trial court found, there had been months of negotiation and discussion about the major terms of the agreement, with separate independent counsel being consulted throughout. And, what defendant signed on the day of the marriage was not the agreement itself, but merely his agreement to incorporate various corrections and changes into the final draft. The trial court also found that defendant admitted that he was not forced to sign the agreement, which is supported by the record.

Finally, although defendant testified that he believed that if he did not sign the final agreement he would be "homeless, unemployed, uninsured, and without any income," a fear of financial ruin cannot, by itself, establish economic duress. Defendant must show that plaintiff applied this economic coercion *unlawfully*, *Allard*, 308 Mich App at 551, which he failed to demonstrate.

## 4. MATERIAL BREACH

Defendant also challenges the trial court's ruling that plaintiff did not materially breach the agreement by failing to follow the cooling off provision before filing for divorce. We conclude that the trial court correctly analyzed the issue under the facts and terms of the agreement.

Under Michigan law, "one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994) (quotation marks and citation omitted). This general rule is qualified, however, by the requirement that the "initial breach is *substantial*." *Id*. (emphasis added). "One consideration in determining whether a breach is material is whether the nonbreaching party obtained the benefit which he or she reasonably expected to receive." *Holtzlander v Brownell*, 182 Mich App 716, 722; 453 NW2d 295 (1990).

Although plaintiff acknowledged that she did not wait four months or attend joint marital counseling before filing for divorce, as the trial court recognized, both parties testified that they did eventually attend counseling together for a period of several months. In fact, plaintiff paid for the counseling, and plaintiff did not actively pursue the divorce until after counseling concluded unsuccessfully. And, defendant testified that plaintiff was genuine in attending counseling and trying to save the marriage. This evidence supported the trial court's determination that, although plaintiff did not strictly follow the agreement's terms, the breach was not substantial because her actions largely cured the breach. We similarly agree that any breach was not substantial given that defendant received the benefit that he could reasonably be expected to receive: a period of time in which the parties could attempt to reconcile their marriage and avoid divorce. See *Holtzlander*, 182 Mich App at 722.

## 5. FAILURE TO DISCLOSE ASSETS

We likewise reject defendant's argument that the agreement was unenforceable because plaintiff failed to fully disclose her assets, specifically, a number of gold coins that she received and later sold. When entering into a marital agreement, the parties have a duty to disclose their assets to the other party. See *In re Benker's Estate*, 416 Mich 681, 690-691; 331 NW2d 193 (1982). At the evidentiary hearing, plaintiff testified that she showed defendant the gold coins on the same day that she received them from her mother, and explained to him that the coins were to be distributed to herself and her siblings. Defendant did not offer any contrary testimony. Thus, the undisputed evidence was that defendant was aware of the gold coins before entering into the agreement. See *In re Oversmith's Estate*, 340 Mich 104, 106; 64 NW2d 678 (1954).

## B. INVASION OF SEPARATE ASSETS

### 1. STANDARDS OF REVIEW

We review the trial court's factual findings on the division of marital property for clear error. *Hodge*, 303 Mich App at 554. Clear error occurs "when this Court is left with the definite and firm conviction that a mistake has been made." *Id*. at 555 (quotation marks and citation omitted). "If the trial court's findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts." *Woodington v Shokoohi*, 288 Mich App 352, 355; 792 NW2d 63 (2010). Given that the trial court's "dispositional ruling is an exercise of discretion . . . , the ruling should be affirmed unless the appellate court is left with the firm conviction that the division was inequitable." *Sparks v Sparks*, 440 Mich 141, 152; 485 NW2d 893 (1992). Questions of law are reviewed de novo. *Cunningham v Cunningham*, 289 Mich App 195, 200; 795 NW2d 826 (2010).

### 2. DISCUSSION

On this issue, defendant argues that the trial court was unable to determine if the property division was equitable without first determining the valuation of various properties. He contends that this valuation was necessary for the trial court to properly analyze whether an invasion of plaintiff's separate property was warranted.

The trial court may utilize its equitable powers under MCL 552.23(1) and MCL 552.401 to award separate property to the parties in order to reach an equitable result. In *Allard v Allard (On Remand)*, 318 Mich App 583, 601; 899 NW2d 420 (2017), we held that, "to the extent that parties attempt, by contract, to bind the equitable authority granted to a circuit court under MCL 552.23(1) and MCL 552.401, any such agreement is necessarily void as against both statute and the public policy codified by our Legislature." More specifically, we stated that "the parties to a divorce cannot, through antenuptial agreement, compel a court of equity to order a property settlement that is *in*equitable." *Id*. In other words, parties may not, through a marital agreement, prohibit the trial court from exercising its equitable powers under these statutes. *Id*. at 602-603. We reasoned that under the plain statutory language, "the Legislature intends circuit courts, when ordering a property division in a divorce matter, to have equitable discretion to invade separate assets if doing so is necessary to achieve equity." *Id*. at 600-601. These two statutes do not give "parties to a divorce any statutory right to *petition* for invasion of separate assets—at least none that is distinct from the parties' right to petition for divorce in the first instance. Rather, the statutes

simply empower the circuit court." *Id*. at 601. Hence, "parties have no discernible rights to waive under MCL 552.23(1) and MCL 552.401." *Id*.

Defendant misreads and mischaracterizes our *Allard* decision. He does not possess a statutory right to invade plaintiff's separate property; rather, the trial court possesses the authority to do so if equity demands it. That is why the *Allard* Court held that parties cannot through a marital agreement *force* a trial court to order a property settlement that is *not equitable*. See *Allard*, 318 Mich App at 601. Our holding presupposed an inequitable agreement; otherwise, there would be no issue in dividing the property through that agreement's terms. Here, because the trial court found that the agreement's distribution of the property was fair and equitable, it properly ruled that *Allard* was inapplicable.

Additionally, the record demonstrates that the trial court already possessed a valuation of the properties and assets. Although defendant challenged the appraisals for some of the real property, this was based on his own belief that the appraisals were "wrong." He submitted no further documentation or evidence, and failed to demonstrate *how* these inaccuracies would result in an inequitable distribution, i.e., that the inaccuracies would result in his receiving an inequitable amount of property and assets. The trial court did not err.

## C. ATTORNEY FEES

Lastly, we reject defendant's contentions that he was entitled to attorney fees.

## 1. STANDARDS OF REVIEW

In a divorce action, this Court reviews for an abuse of discretion an award of attorney fees. *Loutts v Loutts*, 309 Mich App 203, 215-216; 871 NW2d 298 (2015). The trial court's factual findings are reviewed for clear error, while issues of law are reviewed de novo. *Id*. at 216.

## 2. DISCUSSION

Michigan follows the " 'American Rule,' " which states that "attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract." *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2005). In a divorce action, attorney fees are permitted by statute and court rule. *Id*. MCR 3.206(D)(1) states that,

> A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

MCR 3.206(D)(2) provides two ways for a party in a divorce action to obtain attorney fees, only one of which is relevant to this appeal: the party requesting attorney fees "must allege facts sufficient to show that" he or she "is unable to bear the expense of the action, including the expense

-11-

of engaging in discovery appropriate for the matter, and that the other party is able to pay[.]" MCR 3.206(D)(2)(a).[10]

MCR 3.206(D)(2)(a) has been interpreted "to require an award of attorney fees in a divorce action 'only as necessary to enable a party to prosecute or defend a suit.' " *Loutts*, 309 Mich App at 216 (citations omitted). "[A] party 'may not be required to invade her assets to satisfy attorney fees when she is relying on the same assets for her support.' " *Id*. (citations omitted). The trial court must "give 'special consideration to the specific financial situations of the parties and the equities involved.' " *Id*. at 218 (citation omitted).

In his trial brief, defendant argued that, because plaintiff had terminated his employment, he was "unable to pay the costs associated with this litigation," and had "accumulated legal debt in excess of $15,000." At the final divorce hearing, defendant testified that he had exhausted his "retirement savings" and his "regular savings," and had "inadequate income to meet even the most basics needs." However, defendant failed to offer any evidence outlining the details of his attorney fees, such as hourly rate, number of hours worked, and the experience level of his attorney. This is in contrast to *Woodington*, in which the plaintiff submitted relevant documentation to support her request for attorney fees. See *Woodington*, 288 Mich App at 371. Defendant bore the burden of submitting *sufficient* facts to justify the award, see *id*. at 370, and the trial court did not abuse its discretion by determining that defendant failed to satisfy his burden.

Affirmed.

/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Kirsten Frank Kelly

---

[10] Defendant's request related entirely to MCR 3.206(D)(2)(a), making (2)(b) inapplicable.