*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DENNIS KEITH HARRIS,

         Plaintiff-Appellant,

v

LINDA THERESA HARRIS,

         Defendant-Appellee.

UNPUBLISHED
October 20, 2022

No. 358497
Sanilac Circuit Court
LC No. 20-038711-DO

Before: RICK, P.J., and O'BRIEN and PATEL, JJ.

PER CURIAM.

Plaintiff, Dennis Keith Harris, appeals as of right the trial court's judgment of divorce dissolving the parties' marriage and dividing the marital assets. Dennis challenges the trial court's invalidation of a postnuptial agreement that the parties allegedly signed twenty-two months before this action was commenced. Defendant, Linda Theresa Harris, denied that she signed the agreement. The trial court found that, even if Linda did sign the postnuptial agreement, she not have the capacity to enter into a binding contract due to her mental state. Because the trial court's findings were based on the trial court's credibility assessments, we conclude that the court's findings were not clearly erroneous. We also conclude that the division of the marital estate was fair and equitable. Accordingly, we affirm.

## I. BACKGROUND

The parties met and began dating in 2003. In 2004, Linda purchased what would later become the marital home for $175,000.[1] The parties began cohabitating immediately after the home was purchased. They were married in 2008.

---

[1] We note that the trial court's August 11, 2021 opinion erroneously states that Dennis purchased and financed the home. But it is undisputed that Linda was the one that purchased and financed the home.

Before and during the marriage, Dennis was self-employed as a taxidermist. Linda maintains that she was active in Dennis' business, but Dennis asserts that she only helped out sporadically. Linda was employed as a registered nurse before and during the marriage. For the duration of the marriage, the parties kept their earnings, retirement accounts, and taxes separate. Linda accumulated several retirement accounts before the marriage. She did not continue to contribute to those accounts during the marriage. And she accumulated one new retirement account during the marriage. Dennis did not have any retirement accounts before the marriage and did not accumulate any during the marriage.

Dennis maintains that the parties entered into a postnuptial agreement on August 9, 2018. Dennis drafted the document. He claimed that the parties agreed to all of the terms. He asserted that the parties entered into the agreement in contemplation of divorce.[2] The agreement specified that Dennis would (1) pay the $23,000 balance on Linda's car loan, (2) pay the balance on the mortgage not to exceed $102,000, and (3) pay Linda an additional $37,000 for the balance of her equitable interest in the home.[3] The agreement stated that Linda would transfer the deed to the home to Dennis once the terms had been met. It also stated, "[i]f the house gets sold in a fight" Dennis would receive "the first [$]102,000 or the payoff and extra payments made then profits will be split 50/50."

The agreement was typed up and then purportedly signed by both parties. The signatures were not witnessed or notarized. Linda adamantly denied that she signed the agreement. She claimed that her signature was forged on the document. Although she admitted that that parties had verbally discussed the matters outlined in the agreement, she testified that they had not agreed on the actual figures because she wanted to get an appraisal of the home. She also testified that she was suffering from emotional instability and depression at that time.

It was undisputed that Dennis paid off the mortgage and Linda's car loan. Linda admitted that Dennis deposited funds into her bank account, but could not recall the amount. The trial court found that the items included in the August 2018 agreement were paid shortly after the agreement was allegedly signed. But the trial court concluded that the agreement was not valid because there was no evidence that Linda signed it.[4] Even if Linda did sign it, the trial court found that she lacked the capacity to enter into a binding contract in August 2018 due to her depression and mental state. The trial court further noted that the parties attempted reconciliation after the agreement was allegedly signed and they did not actually move forward with a divorce at that time.

---

[2] A divorce action was filed in 2018, but it was dismissed due to lack of service on Linda. The parties continued to cohabitate in the martial home until August 26, 2019 and this action was not commenced until June 2020.

[3] Dennis testified that Linda valued the home at $220,000. The mortgage balance was approximately $100,000. Thus, Dennis claimed that there was $120,000 in equity that the parties agreed to split equally. He maintained that he paid Linda's $60,000 share of the equity by paying off her $23,000 car loan and depositing $37,000 into her bank account.

[4] The trial court's opinion erroneously refers to Linda as plaintiff and Dennis as defendant in its discussion of the signing of the document.

Relevant to this appeal, the trial court ordered the sale of the marital home, awarded Linda $20,000 for her premarital equity in the home, and ordered the parties to split the remaining sale proceeds equally. In addition, the trial court awarded Linda all of her retirement accounts, concluding that it was not equitable to award Dennis one half of Linda's accounts because the parties kept their finances separate, Dennis did not file income taxes during the marriage, and he did not contribute to his own retirement funds during the marriage. But the trial court held that Dennis could establish his own retirement accounts when he filed his tax returns and that he was entitled to his entire retirement accounts. A judgment of divorce was entered on August 24, 2021. Dennis now appeals.

## II. STANDARDS OF REVIEW

Because postnuptial agreements are contracts, we review the trial court's interpretation of the contract de novo as well as its ruling on legal questions that affect the contract's validity. *Hodge v Parks*, 303 Mich App 552, 558, 844 NW2d 189 (2014); *Lentz v Lentz*, 271 Mich App 465, 471-472 & n 3, 721 NW2d 861 (2006). But we review "any factual questions regarding the validity of the contract's formation" for clear error. *Hodge,* 303 Mich App at 558. "A finding is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction that a mistake was made." *Loutts v Loutts*, 298 Mich App 21, 26; 826 NW2d 152 (2012). "Special deference is afforded to a trial court's factual findings that are based on witness credibility." *Hodge,* 303 Mich App at 555.

"This Court reviews a property distribution in a divorce case by first reviewing the trial court's factual findings for clear error, and then determining whether the dispositional ruling was fair and equitable in light of the facts." *Olson v Olson*, 256 Mich App 619, 622; 671 NW2d 64 (2003). "The court's dispositional ruling should be affirmed unless this Court is left with the firm conviction that the division was inequitable." *Pickering v Pickering*, 268 Mich App 1, 7; 706 NW2d 835 (2005).

## III. REAL PROPERTY

## A. POSTNUPTIAL AGREEMENT

Dennis maintains that the trial court clearly erred by invalidating the postnuptial agreement because the testimony established that Linda signed the agreement and understood its terms. We disagree.

"Under Michigan law, a couple that is maintaining a marital relationship may not enter into an enforceable contract that anticipates and encourages a future separation or divorce." *Hodge,* 303 Mich App at 558 (quotation marks and citation omitted). The enforcement of such agreements "would encourage separation or divorce, which is not an appropriate public policy." *Id*., citing *Randall v Randall*, 37 Mich 563, 571 (1877). But if an agreement "seeks to promote marriage by keeping a husband and wife together, Michigan courts may enforce the agreement if it is equitable to do so." *Hodge,* 303 Mich App at 559.

In this case, there was a factual dispute as to the validity of the postnuptial agreement because Linda adamantly denied signing it. In fact, she maintained that her signature was forged on the agreement. Since the signatures were not witnessed or notarized, they were not

authenticated. Linda's stepmother claimed that Linda told her about the agreement three months after it was signed. But her stepmother did not witness Linda sign the agreement. Linda admitted that she told her stepmother about her discussion with Dennis, but she denied that she told her stepmother that they reached an "agreement." Other than Dennis' own, self-serving testimony, there was no evidence that Linda actually signed the agreement.

In addition, Linda testified that she was suffering from depression in August 2018. "The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which the person is engaged." *In re Erickson Estate*, 202 Mich App 329, 332; 508 NW2d 181 (1993). A person is mentally unsound to contract if "the person had no reasonable perception of the nature or terms of the contract." *Id.* A person may be mentally competent, but still incapable of conducting business successfully. *Id.* at 333. It was undisputed that Linda suffered from emotional problems and depression during the marriage. It was also undisputed that she attempted suicide a year after the agreement was allegedly signed. But Dennis denied that Linda was suffering from depression or was under any stress when she signed the August 2018 agreement.

Given the factual disputes whether the agreement was actually signed, or whether Linda had the ability to enter into an agreement in August 2018, the trial court's findings regarding the validity of the agreement required it to assess the credibility of the witnesses. This Court affords special deference "to a trial court's factual findings that are based on witness credibility." *Hodge,* 303 Mich App at 555. Because there was testimony to support the trial court's factual findings, we conclude that the trial court did not clearly err in invalidating the postnuptial agreement.

## B. DIVISION OF EQUITY

Dennis next argues that the trial court's award of the equity in the home was unfair and inequitable. We disagree.

When dividing a marital estate, the trial court's goal is to arrive at an equitable division of the property considering the specific circumstances of the case. *Seifeddine v Jaber*, 327 Mich App 514, 522; 934 NW2d 64 (2019). First, the trial court must determine what property is considered marital property and what is considered separate property. *Cunningham v Cunningham*, 289 Mich App 195, 200-201; 795 NW2d 826 (2010). Marital property is "that which is acquired or earned during the marriage," and in contrast, separate property is best characterized as "that which is obtained or earned before the marriage." *Id.* at 201, citing MCL 552.19. Income earned during the marriage is presumed to be marital property. *Cunningham*, 289 Mich App at 201. Generally, each party takes their own separate property. *Id.*

The trial court may also weigh the following factors in dividing the marital estate:

(1) the duration of the marriage, (2) the contributions of the parties to the marital estate, (3) the age of the parties, (4) the health of the parties, (5) the life situation of the parties, (6) the necessities and circumstances of the parties, (7) the parties' earning abilities, (8) the parties' past relations and conduct, and (9) general principles of equity. [*Id.*]

Dennis claims that Linda received payment for her 50% share of the equity in the home when he paid off her car loan and gave her an additional $37,000 in cash. But Dennis did not use separate property to pay off the mortgage, pay off the car loan, or transfer money to Linda. Those payments were all made with income that he earned during the marriage, which was marital property. See *Cunningham*, 289 Mich App at 201. The parties continued to live together as husband and wife for nearly two years after those payments were made. The home and the vehicle were marital property secured by liens. Dennis simply made payments on marital debt with marital funds while the parties were married and cohabitating.

Additionally, both parties shared in the maintenance of the marital home. As this Court has explained, "the sharing and maintenance of a marital home affords both spouses an interest in any increase in its value (whether by equity payments or appreciation) over the term of a marriage" and the increase in value is marital property subject to equitable division. *Reeves v Reeves*, 226 Mich App 490, 495-496; 575 NW2d 1 (1997).

Finally, it was undisputed that Linda purchased the home before the marriage and made a down payment when she purchased the home. "[T]he down payment, the equity built up before the parties' marriage, and any appreciation that occurred before the marriage" are part of Linda's separate estate. *Korth v Korth,* 256 Mich App 286, 293; 662 NW2d 1114 (2003).

We conclude that the trial court's decision to award Linda $20,000 in premarital equity and divide the remaining proceeds of the sale of the marital home equally between the parties was fair and equitable.

## IV. RETIREMENT ACCOUNTS

Dennis also argues that the trial court clearly erred in awarding Linda the full share of her retirement accounts. We disagree.

This Court has held that a spouse's separate property can distributed to the other spouse if the statutory exceptions under either MCL 552.23(1) or MCL 552.401 is met. *Reeves*, 226 Mich App at 494. MCL 552.23(1) allows for the invasion of a spouse's separate property when the other spouse "demonstrates additional need." *Reeves*, 226 Mich App at 494. Likewise, under MCL 552.401, invasion of a spouse's separate property is permitted if the other spouse "significantly assists in the acquisition or growth" of the asset. *Reeves*, 226 Mich App at 495. But the appreciation of a premarital asset should not be considered part of the marital estate if the appreciation is due to "wholly passive" appreciation. See *id*. at 497. A premarital asset increases in value by wholly passive appreciation when there is no addition of capital or active management during the marriage. See *Dart v Dart*, 460 Mich 573, 585 n 6; 597 NW2d 82 (1999).

Linda had several premarital retirement accounts at the time that she and Dennis married, but no additional contributions were made to those accounts during the marriage. Any value that those premarital accounts gained was passive and, therefore, those accounts were not part of the marital estate. See *Reeves*, 226 Mich App at 497. Other than sharing the payment of household expenses, there was no evidence that Dennis made any direct contributions to Linda's premarital retirement accounts or otherwise assisted in their growth during the marriage to meet the statutory exception under MCL 552.401. See *Reeves*, 226 Mich App at 495. He also has not demonstrated

an additional need to allow for the invasion of Linda's separate premarital retirement accounts under MCL 552.23(1).

Linda also acquired one retirement account during the marriage. Applying the principals of equity, the trial court awarded the full value of that account to Linda. Dennis owns a lucrative taxidermy business. He earned six-figures annually. The trial court awarded Dennis 100% of the value of his business. The trial court also permitted him to establish his own retirement accounts, and he was entitled to retain 100% of the value of those accounts. We conclude that the trial court's decision to award each party the full value of their own retirement accounts was fair and equitable.

Affirmed.

/s/ Michelle M. Rick
/s/ Colleen A. O'Brien
/s/ Sima G. Patel